645 So.2d 398 (1994)
Inquiry Concerning A Judge No. 93-62, re: P. Kevin DAVEY.
No. 82328.
Supreme Court of Florida.
October 13, 1994.
Rehearing Denied December 2, 1994.
*399 Joseph J. Reiter, Chairman and Ford L. Thompson, General Counsel, Tallahassee, and Charles P. Pillans, III of Bedell, Dittmar, DeVault & Pillans, P.A., Jacksonville, for petitioner.
Richard C. McFarlain, Charles A. Stampelos, Harold R. Mardenborough and Christopher Barkas of McFarlain, Wiley, Cassedy & Jones, P.A., Tallahassee, for respondent.
Robert P. Smith, Tallahassee, amicus curiae.
Jimmy Hatcher, Bristol, amicus curiae.
PER CURIAM.
We have for review a recommendation of the Judicial Qualifications Commission that Judge P. Kevin Davey be removed from office. We have jurisdiction. Art. V, § 12, Fla. Const. Based on this record, we impose a public reprimand.

I. FACTS
Judge P. Kevin Davey was a partner in the law firm of Douglass, Davey, Cooper & Coppins, P.A. (the firm), prior to becoming a judge. In the late spring of 1984, he announced to the firm's members that he had decided to run for a vacant seat as judge of the Circuit Court of the Second Judicial Circuit. The shareholders subsequently met and agreed on the terms of Davey's separation from the firm and the disposition of his cases.

A. Davey's Divorce from the Firm
The shareholders of the firm agreed on June 6, 1984, that Davey would cease to be a partner after June 30, 1984, and that all members would confer "ASAP" to inventory his contingent fee cases to determine the percentage of completion. Davey would be paid on a pro-rata basis on all cases partially completed by June 30; those cases on which he performed no work by that date would be reassigned. Davey and Douglass could not agree, however, on the amount Davey was to be paid for his share in the ownership of the building housing the firm. Davey and Douglass *400 disagreed vehemently on this topic and this caused Davey's relationship with the firm to rapidly deteriorate. The firm ultimately presented Davey with a "lock-out" letter on September 1, 1984, delivered to Davey's doorstep and discovered by his children. The letter was signed by the partners and advised Davey that he was being expelled from the firm, that he would lose his health and malpractice insurance, and that the locks to his office would be changed. This issue of Davey's share in the building was ultimately resolved in Davey's favor in a civil lawsuit.
Davey was elected judge on September 4, 1984, with his term to begin on January 8, 1985. The members of the firm entered into a second termination agreement on September 20, 1984, wherein Davey agreed that he would "take responsibility for completing or reassigning to other attorneys within the firm or other qualified attorneys outside the firm all cases he was handling as of June 6, 1984, and afterwards."
Nine years after Davey left the firm, the Judicial Qualifications Commission (the Commission) filed the present charges against him alleging violations of Canons 1[1] and 2A[2] of the Florida Code of Judicial Conduct based on his handling of two cases during the breakup of the firm.

B. The Bryant Case
John Cooper, a member of the firm, testified that he and two other members of the firm, Michael Coppins and Tom Powell, met with Davey in the first two weeks of November 1984 to go over Davey's case list. When they came to the Bryant case, Davey said that the case was not a good case, that he had discussed it with the client, that the client had decided not to file suit, and that Davey was going to close the file. Cooper's testimony was corroborated by Coppins. Evidence adduced before the Commission showed that in August and September 1984, Davey corresponded with the adjusters for the insurer, and in October a settlement of $24,000 was offered and accepted by Davey, who had the check made out to himself and mailed to his home. Upon receipt of the check, Davey executed a release and closing statement on October 31, 1984. The settlement check was negotiated through Davey's personal account and a fee of $8,000 was deposited in his account pursuant to his agreement with Bryant.
Members of the firm learned of Davey's disposition of the Bryant case by happenstance and decided to confront him. Cooper testified that at a meeting on November 21, 1984, he and Davey again went over Davey's case list and when they reached the Bryant case, Davey responded the same as before  that it was not a good case, that the client was not pursuing it, and that he was closing the file. According to Cooper, when he presented Davey with a copy of the negotiated check, Davey admitted that he had concealed the case and said that he had done so because he was afraid that the firm would not honor its termination agreement. Davey said that he was holding the money as security.
Davey's testimony concerning the Bryant case is basically similar to Cooper's except for the following explanations. According to Davey, the initial meeting concerning the Bryant case took place not in November but in July 1984, shortly after the June termination agreement calling for a meeting on Davey's cases "ASAP." At that meeting, Davey told Cooper and Coppins that the case was a poor one because he was having difficulty in obtaining Bryant's medical records and in finding an expert to establish causation. Cooper suggested that Davey refer the case to an outside attorney for disposition. Davey tried unsuccessfully several times to contact the outside attorney to give him the case, and was surprised when the adjuster eventually called and offered $24,000 in settlement. Davey testified that at the second meeting with the partners, the partners burst into the room and accused him of stealing. He did not recall telling the partners at that time that it was a bad case or that he kept the money as security. He testified *401 that he did not disclose the case to the firm because he believed the firm had abandoned it and that if the partners found out about the fee they would want a part of it. Davey ultimately paid the firm its share, approximately $1,400, on December 20, 1984.

C. The Breyer Case
Carol Breyer was severely injured in an accident and agreed in June 1982 to have the firm represent her. Because the tortfeasor's insurance policy was limited to $10,000, it was clear that the bulk of the recovery would come from the uninsured motorist (UM) claim. The claim against the tortfeasor was settled in June 1983 for $10,000. Davey removed portions of the office file relating to the UM claim and closed the file on August 6, 1984, by filling out a "Closed File Check List" and signing his secretary's initials.
Davey subsequently entered into negotiations between September 18 and December 13 with the adjuster representing the UM carrier. The adjuster wrote Davey a letter dated December 6, addressed to Davey's home, in which the adjuster made a settlement offer of $127,500. Davey accepted the offer and asked that the check be mailed to his home. The check was mailed on December 13 and Davey took it to the firm's bank on December 21; it was collected and credited to the firm's account on December 31. The Commission found that the check was made payable to the firm and that this alone foiled Davey's attempt to convert the entire fee.
Cooper, Coppins, and Douglass testified that they met with Davey at some time between November 26 and December 21 to discuss Davey's failure to disclose the Bryant case noted above, and that at that meeting Douglass specifically asked Davey, "Are there any other cases like the Bryant case that we should know about?" Davey replied, "No, sir. There are not," and did not mention the Breyer case. Cooper testified that he first learned of the Breyer case on December 21 when Davey approached him at a social function and told him that he had settled the case for $127,500, which should produce a fee of about $40,000. Cooper at first testified that he was uncertain if he ever saw the settlement check, but later said that he saw a copy and that it was payable to the firm. Douglass testified that he first learned of the case when the bank called him concerning the settlement check. Douglass testified that he too was uncertain if he ever saw the check, but later said that he believed he did.
Davey testified that he signed his secretary's initials to the file, but said that he had done so on other occasions and did so here because the $10,000 tortfeasor claim was completed. He concealed the UM portion of the case from the firm in order to "keep my options open," and contended that the check was made out to himself and that if he had intended to convert the entire fee he could easily have negotiated the check through his personal account.

D. The Commission's Findings and Conclusions
After hearing testimony and accepting evidence, the Commission found that Davey intended to convert to himself the entire fee in both the Bryant and Breyer cases:
22. With respect to the Emma Bryant case, the Commission finds that the evidence is clear and convincing that Judge Davey intended to convert the entire Bryant fee to himself, that Judge Davey misrepresented the merits and value of the Bryant case to Messrs. Cooper and Coppins, and that, even if the first meeting to discuss Judge Davey's cases occurred in July 1984, Judge Davey nevertheless misrepresented the case to Cooper in November 1984 after he had settled the case and negotiated the draft through his personal account. The Commission rejects Judge Davey's claim that the Firm had "abandoned" the Bryant case because any abandonment was based upon a misrepresentation of the merits and value of the case. In any event, after it was apparent to Judge Davey that the insurance carrier was seeking to settle the case and, in fact, had offered to settle the case for $24,000, Judge Davey had an affirmative responsibility under the termination agreement with the firm to share that information and the fee with the Firm.

*402 23. With respect to the Carol Breyer case, the evidence is also clear and convincing that the actions of Judge Davey, by closing the Breyer file on August 6, 1984; by forging his secretary's initials to the Closed File Check List; by failing to advise the Firm with respect to the existence of the Breyer case or his ongoing negotiations between September and December 1984 to settle the case; by his untruthful response to Mr. Douglass' question, "are there any other cases like the Bryant case?" at a time when he was engaged in negotiations for settlement of the case for a substantial sum, to which the Firm was unquestionably entitled to share in the fee; by his failure, after receiving a firm written offer of settlement on December 6, 1984, and settling the case on December 13, 1984, to advise the Firm of the settlement until December 21, 1984; by his signing as witness to the Breyer release using his home address; and by directing the adjuster to send the draft to his home address in order to keep his options open, all constitute clear and convincing evidence that Judge Davey intended to convert the Breyer fee and was thwarted in that effort only because the draft was payable to the Firm and the Bank contacted Mr. Douglass regarding receipt of the draft.
The Commission found that public confidence in the judiciary would be substantially eroded if Judge Davey were to remain on the bench. He misrepresented the Bryant and Breyer cases to the members of the firm, the Commission found, and "lied under oath to the Commission" about it. This demonstrates "his present unfitness to hold office," the Commission concluded:
24. Public confidence and perception of the judiciary would be substantially eroded if Judge Davey remains on the Bench in the face of the findings of the Commission that he attempted to convert the Bryant fee and the Breyer fee and in the course thereof made numerous misrepresentations and untrue statements to the members of his Firm and lied under oath to the Commission at the trial of this cause in an attempt to justify his conduct. The record, therefore, shows and the Commission finds by clear and convincing evidence that Judge Davey's conduct with respect to the Emma Bryant case demonstrates his present unfitness to hold judicial office in this State. The record further shows and the Commission also finds by clear and convincing evidence that Judge Davey's conduct with respect to the Carol Breyer case demonstrates his present unfitness to hold judicial office in this State.
The Commission concluded that Davey's handling of the Bryant and Breyer cases evidences "character flaws" unmitigated by the passage of time, and that this problem has been "compounded" by Davey's false testimony before the Commission. Davey should be removed from office, the Commission recommended:
Judge P. Kevin Davey, by conducting himself in the manner set out in the above Findings of Fact, intentionally committed serious and grievous wrongs of a clearly unredeeming nature. The Commission rejects Judge Davey's contention that the events which occurred in 1984 and which gave rise to the charges are too remote to affect Judge Davey's present fitness to serve as a judge. Judge Davey's conduct with respect to the Emma Bryant case and with respect to the Carol Breyer case evidence character flaws which the passage of time alone does not mitigate or justify. In addition, Judge Davey has compounded his original misconduct by appearing before the Commission and attempting to explain his conduct through testimony that the Commission finds to be false in material respects... . Judge Davey has rendered himself an object of disrespect and public confidence in the judiciary will by eroded if he remains a member of it. Judge Davey is guilty of violating Canons 1 and 2A of the Code of Judicial Conduct. The Commission finds by clear and convincing evidence that Judge Davey's violations of these Canons demonstrate a present unfitness to hold office.

E. Issues Presented
Davey initially contends that this Court lacks jurisdiction over the acts in issue because they took place before he assumed *403 office as judge. Davey next claims that the Commission erred in its findings of guilt and recommendation of removal because its material findings of fact were not supported by clear and convincing evidence. Further, he contends that the Commission's recommendation of removal was based in part on its conclusion that he lied to the Commission, but that he was never charged with being untruthful and never had an opportunity to defend against that accusation. And finally, Davey contends that removal is not warranted under existing caselaw.

II. JURISDICTION
Article V, section 12, Florida Constitution, was adopted by special election in 1972 and originally provided for removal of a judicial officer for misconduct, but did not specify when the misconduct may have occurred:
Upon recommendation of two-thirds of the members of the judicial qualifications commission, the supreme court may order that the justice or judge be disciplined by appropriate reprimand, or be removed from office with termination of compensation for willful or persistent failure to perform his duties or for other conduct unbecoming a member of the judiciary... .
Art. V, § 12(d), Fla. Const. (1973).
This Court in interpreting this provision held that the Commission lacked authority to investigate a sitting circuit judge's activities that occurred while he held the prior office of judge of a criminal court of record. See State ex rel. Turner v. Earle, 295 So.2d 609 (Fla. 1974). We reasoned that the majority of jurisdictions held that where a constitutional provision authorizes removal for misconduct but does not specify the term of office in which the misconduct must occur then the officer cannot be removed for acts that take place in other than the present term.
Subsequent to our decision in Turner, Florida voters approved by general election in 1974 an amendment to section 12 that addressed the issue of when the misconduct may have occurred. Section 12 was amended to read in part:
There shall be a judicial qualifications commission vested with jurisdiction to investigate and recommend to the Supreme Court of Florida the removal from office of any justice or judge whose conduct, during term of office or otherwise occurring on or after November 1, 1966, (without regard to the effective date of this section) demonstrates a present unfitness to hold office, and to investigate and recommend the reprimand of a justice or judge whose conduct, during term of office or otherwise occurring on or after November 1, 1966 (without regard to the effective date of this section), warrants such a reprimand.
Art. V, § 12(a), Fla. Const.
Judge Davey argues that the 1974 amendment was enacted to negate Turner's holding that a judge cannot be removed for misconduct that took place during a prior term in a different judicial office. Thus, Davey reasons, the misconduct referred to in amended section 12 contemplates only those acts occurring during a prior term of judicial office  not acts occurring outside judicial office. We disagree.
The language of section 12 is unambiguous on its face and we conclude that it means just what it says: The Commission may investigate and recommend the removal or reprimand of any judge whose conduct in or outside of office warrants such action. This Court has consistently ruled that pre-judicial conduct may be used as a basis for removal or reprimand of a judge. See, e.g., In re Meyerson, 581 So.2d 581 (Fla. 1991); In re Carnesoltas, 563 So.2d 83 (Fla. 1990); In re Capua, 561 So.2d 574 (Fla. 1990); In re Sturgis, 529 So.2d 281 (Fla. 1988); In re Berkowitz, 522 So.2d 843 (Fla. 1988); In re Byrd, 511 So.2d 958 (Fla. 1987); In re Speiser, 445 So.2d 343 (Fla. 1984).
We hold that the Commission has constitutional authority to investigate prejudicial acts and recommend to this Court the removal (for unfitness) or reprimand (for misconduct) of a sitting judge. We conclude that the Commission acted within its authority in the present case in investigating Judge Davey's handling of the Bryant and Breyer cases in order to assess Davey's present fitness as a judge.

*404 III. CLEAR AND CONVINCING EVIDENCE
"The findings and recommendations of the Judicial Qualifications Commission are of persuasive force and should be given great weight. However, the ultimate power and responsibility in making a determination rests with this Court." In re LaMotte, 341 So.2d 513, 516 (Fla. 1977) (citation omitted). Because of the serious consequences attendant to a recommendation of reprimand or removal of a judge, the quantum of proof necessary to support such a recommendation "must be `clear and convincing.' There must be more than a `preponderance of the evidence,' but the proof need not be `beyond and to the exclusion of a reasonable doubt.'" Id.
This intermediate level of proof entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.
Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983).
Applying this standard to the present case, we conclude that the Commission's ultimate findings concerning Davey's handling of the Bryant case are supported by clear and convincing evidence. The testimony of Cooper, Coppins, and Douglass as to when the various meetings with Davey took place and what transpired at those meetings is direct, unequivocal, and consistent. Their version of events is logical and supported by written evidence. Davey's testimony, on the other hand, is vague, indecisive, and unsupported. We approve the Commission's findings that Davey misrepresented the merits of the case, and that he concealed the negotiations, settlement, and fee from his former partners.
The Commission's ultimate findings concerning Davey's handling of the Breyer case, on the other hand, are not supported by sufficient evidence. The Commission relied on the cumulative weight of the following evidence: Davey closed the Breyer office file by signing his secretary's initials more than a year after the tortfeasor portion of the claim had been settled; Davey concealed from the firm both the case and his negotiations with the carrier; Davey responded untruthfully to Douglass' question, "Are there any other cases like the Bryant case?"; and Davey had the correspondence and settlement check sent to his home address. The Commission concluded that Davey intended to convert the entire fee and was thwarted in his effort only because the settlement check was made payable to the firm, not him.
We note that Davey testified that he closed the Breyer office file because the tortfeasor claim was completed and that he had in other cases signed his secretary's initials to closed files. He testified that he did not conceal the file, that it was listed as a closed file on the case list reviewed by the partners. He concealed the negotiations in order "to keep my options open," presumably in case the firm tried to shortchange him under the termination agreement. He testified that he never intended to permanently deprive the firm of the entire fee. All parties agree that Davey voluntarily disclosed the Breyer settlement to the firm on December 21, 1984, and relinquished the check to the firm's account.
The Commission's theory of wrongdoing turns upon its conclusion that Davey was thwarted in his effort to convert the fee only by the fact that the settlement check was made payable to the firm instead of to Davey. Yet, this conclusion is unsupported by the record. The Commission never introduced a copy of the check into evidence to show to whom it was payable, and instead relied on the testimony of Cooper and Douglas. The record shows that when Cooper was questioned by Davey's lawyer Cooper testified that he could not certify that he ever saw the check:

*405 Q. Do you remember seeing the Breyer draft?
A. I can't tell you, Mr. Barkas, that I have an independent recollection that I saw it. But I think I can tell you that if I followed my ordinary routine and practice, I most likely did see it at some time.
Q. Before it would have been deposited?
A. I don't know. I may have seen a copy or what, I just don't know. If it was a draft that came into the firm that was a big one like that, I would usually take a peek at it just to look at it.
Q. You are guessing? You don't know?
A. That's my routine. I can't tell you independently that I actually looked at the draft.
And then several minutes later in response to a question by a member of the Commission, Cooper inexplicably said the exact opposite  that he did see a copy of the check, and it was payable to the firm.
JUDGE GILLMAN: But the main question that I was going to ask you before ... which is the draft of December 21st in the Breyer case, to whom was that draft from the insurance company, from GEICO, made payable?
THE WITNESS: I do not have it in front of me, but I have seen a copy of it, and my recollection is that it was made payable to the client and to the law firm.
Cooper was not questioned concerning his change in testimony.
The only other testimony on this point on which the Commission could have relied was that of Douglass. The record shows that his testimony is no more conclusive than that of Cooper:
Q. But at some point in time, did you thereafter learn that there was a Breyer case and that that case had, in fact, been settled?
A. Yes, I learned from the events that a draft made payable to the firm was being presented by Davey involving this case, which I knew nothing about.
... .
Q. The bank draft in the Breyer case, you didn't see that, did you?
A. I don't know that I ever saw it. I could have. I could have even been the one that signed it.
Q. But you don't have any specific recollection of seeing it?
A. No. I think I did see a copy of it.
Testimony before the Commission on this point is indecisive, confused, and contradictory  a far cry from the level of proof required to establish a fact by clear and convincing evidence: "[T]he facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty, and the witnesses must be lacking in confusion as to the facts at issue." Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983) (quoting Nordstrom v. Miller, 227 Kan. 59, 605 P.2d 545, 552 (1980)).
The record fails to support the Commission's finding that the settlement check was made payable to the firm rather than Davey. Absent this key finding, the Commission's ultimate finding that Davey intended to convert the entire Breyer fee is not supported by clear and convincing evidence in the record. We disapprove the Commission's findings on this issue.

IV. LACK OF CANDOR
The Commission, as a constitutional body charged with the duty to investigate the state judiciary, has a right to expect absolute candor from the judges appearing before it. Where a judge admits wrongdoing and expresses remorse before the Commission, this candor reflects positively on his or her present fitness to hold office and can mitigate to some extent a finding of misconduct. See, e.g., In re Byrd, 511 So.2d 958 (Fla. 1987). Simply because a judge refuses to admit wrongdoing or express remorse before the Commission, however, does not mean that the judge exhibited lack of candor. Every judge who believes himself or herself truly innocent of misconduct has a right  indeed, an obligation  to express that innocence to the Commission, for the Commission above all is interested in seeking the truth.
*406 The parties direct us to no Florida case defining the circumstances under which lack of candor before the Commission can be used as a basis for the reprimand or removal of a judge. In light of the subjective nature of such a finding and its serious consequences, we set forth the following guidelines.
First, only where lack of candor is formally charged and proven may it be used as a basis for removal or reprimand.[3] The Commission's own rules provide that if that body finds probable cause to proceed against a judge, the judge shall be notified of all charges that may result in removal or reprimand:
RULE 7. FORMAL CHARGES  PROCEEDINGS
(a) If the Commission finds probable cause that formal charges should be filed against the judge.... [i]t shall direct Counsel to cause to be served on the judge a copy of Notice of Formal Charges... .
(b) The notice shall be issued in the name of the Commission and specify in ordinary and concise language the charges against the judge and allege essential facts upon which such charges are based, and shall advise the judge of his right to file a written answer to the charges against him... .
Fla.Jud.Qual.Comm'n R. 7. The judge shall have the right and opportunity to defend against the charges:
RULE 16. PROCEDURAL RIGHTS OF JUDGE
(a) A judge shall have the right and reasonable opportunity to defend against the charges by the introduction of evidence, to be represented by attorney(s), and to examine and cross-examine witnesses. He shall also have the right to the issuance of subpoenas for attendance of witnesses to testify or produce books, papers, and other evidentiary matter.
Fla.Jud.Qual.Comm'n R. 16.
We see no reason to treat lack of candor differently from any other charge that the Commission investigates. Indeed, given the consequences that attach to a finding of lying under oath, every judge has a right to expect adequate notice and an opportunity to be heard on this issue.
Where a judge demonstrates lack of candor in testifying before the Commission, that body is free to file an amended notice of formal charges embracing the misconduct. In re Leon, 440 So.2d 1267 (Fla. 1983). Formal charges permit the judge to prepare and present a defense, and this in turn gives the Commission an opportunity to evaluate evidence it might otherwise have overlooked in its quest for the truth. More important, though, it gives this Court a chance to perform its constitutional duty by reviewing, evaluating, and weighing both sides of the issue.
Second, discipline based on lack of candor may be imposed only where the Commission makes particularized findings on specific points in the record. Again, this is necessary to facilitate our review. Without such findings, this Court is left to guess at which points in the record the Commission believed the judge was untruthful and in what manner he or she lied. In short, we are deprived of the benefit of the Commission's eyes and ears. As a reviewing body, we possess limited insight into such subjective matters as a witness's sincerity, demeanor, or tone, or the comparative credibility of competing witnesses. Without the Commission's insight, we can do little more than take a stab in the dark on such matters.
And finally, the lack of candor must be knowing and willful. See, e.g., In re Berkowitz, *407 522 So.2d 843 (Fla. 1988). It is not enough that the Commission finds a particular judge's version of events unworthy of belief, or finds the testimony of another witness more credible or logical. If such were the case, then every judge who unsuccessfully defends against a charge of misconduct would be open to a charge of lack of candor. Rather than showing simply that a judge made an inaccurate or false statement under oath, the Commission must affirmatively show that the judge made a false statement that he or she did not believe to be true. Cf. § 837.02, Fla. Stat. (1993) ("Whoever makes a false statement, which he does not believe to be true, under oath in an official proceeding in regard to any material matter shall be guilty of [perjury]."). The statement must concern a material issue in the case.
In the present case, the Commission found Davey's testimony "not to be worthy of belief," found that Davey "lied under oath to the Commission," and concluded that "Judge Davey has compounded his original misconduct by appearing before the Commission and attempting to explain his conduct through testimony that the Commission finds to be false in material respects." Presumably, the Commission's recommendation of removal was based in part on these findings and this conclusion.
The Commission, however, lodged no formal complaint against Davey charging him with lack of candor in testifying before that body. Further, the Commission failed to make particularized findings on specific points in Davey's testimony to facilitate our review. And finally, the Commission failed to show that Davey knowingly and willfully made a false statement under oath that he did not believe to be true in asserting his innocence before that body. Although Davey concealed the Bryant fee from his former partners, he admitted that fact to the Commission and explained why he did it. And although his actions were clearly ill-advised, evidence presented before the Commission falls short of clear and convincing proof that Davey deliberately testified untruthfully at any point. We disapprove the Commission's findings and conclusion on this point.

V. THE LAW GOVERNING FITNESS
Article V, section 12, Florida Constitution, states that two sanctions are available to this Court for dealing with judicial misconduct  reprimand or removal.
Upon recommendation of two-thirds of the members of the judicial qualifications commission, the supreme court may order that the justice or judge be disciplined by appropriate reprimand, or be removed from office with termination of compensation for willful or persistent failure to perform his duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office... .
Art. V, § 12(f), Fla. Const.
This Court has established mandatory standards governing the conduct of Florida judges by which fitness may be measured. Canons 1 and 2A of the Florida Code of Judicial Conduct provide:
CANON 1
A Judge Should Uphold the Integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
CANON 2
A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities
A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Fla.Code Jud.Conduct, Canons 1, 2A.
This Court has noted in caselaw the heavy duty placed on judges to uphold the integrity of their office:

*408 Lawyers are disbarred only in cases where they commit extreme violations involving moral turpitude, corruption, defalcations, theft, larceny or other serious or reprehensible offenses. Judges should be held to even stricter ethical standards because in the nature of things even more rectitude and uprightness is expected of them. But they too should not be subjected to the extreme discipline of removal except in instances where it is free from doubt that they intentionally committed serious and grievous wrongs of a clearly unredeeming nature. The judge should observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. He should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
In re LaMotte, 341 So.2d 513, 517-18 (Fla. 1977).
We have removed judges where their conduct demonstrated a present unfitness to hold office. See, e.g., In re Graham, 620 So.2d 1273 (Fla. 1993) (judge removed for abuse of power) cert. denied, ___ U.S. ___, 114 S.Ct. 1186, 127 L.Ed.2d 537 (1994); In re Garrett, 613 So.2d 463 (Fla. 1993) (judge removed for shoplifting TV remote control device); In re LaMotte, 341 So.2d 513 (Fla. 1977) (judge removed for charging personal air transportation on a state air travel card). And we have declined to remove judges where the conduct was mitigated by other circumstances or otherwise failed to demonstrate present unfitness. See, e.g., In re Fowler, 602 So.2d 510 (Fla. 1992) (judge not removed for furnishing false information concerning a traffic accident where this was an isolated act).
In the present case, we find that Judge Davey violated Canon 1 of the Florida Code of Judicial Conduct in his handling of the Bryant case after he had been elected to judicial office  i.e., he failed to observe a high standard of conduct that would preserve the integrity and independence of the judiciary. We further find that he violated Canon 2A by the same conduct  i.e., he failed to conduct himself in a manner that would promote public confidence in the integrity and impartiality of the judiciary. We approve the Commission's recommendation that Davey be found guilty of violating these canons. We must now determine whether this misconduct renders Davey unfit to perform judicial duties.

VI. FACTORS AFFECTING FITNESS
In determining fitness to hold judicial office, this Court looks at the relevant circumstances surrounding each particular act of misconduct. Substantive violations of the Florida Code of Judicial Conduct weigh heavily against a judge. In the present case, as noted above, Judge Davey violated Canons 1 and 2A. His violations were substantive and deserving of substantial discipline.
In counterpoint to this misconduct, extensive testimony attesting to Davey's good character and high integrity was presented before the Commission. The Commission noted the following in its report:
Judge Davey called as character witnesses Stephen C. O'Connell, former Chief Justice of the Florida Supreme Court and former President of the University of Florida; C. DuBose Ausley, a Tallahassee attorney, former member of the Florida Ethics Commission and a member of the Board of Regents; Judge J. Lewis Hall, Jr., Circuit Judge, Second Judicial Circuit; Judge Phil Padovano, Chief Judge, Second Judicial Circuit; and offered the affidavits of Roosevelt Randolph, a member of The Florida Bar; John F. Harkness, Jr., Executive Director of The Florida Bar; and Nancy Daniels, Public Defender for the Second Judicial Circuit. Each of the four character witnesses appearing before the Commission testified that Judge Davey's reputation for truth and veracity was good. Mr. Ausley and Judge Padovano also testified that, in their opinion, Judge Davey was presently fit to serve and Judge Hall testified that, in his opinion, Judge Davey was well qualified to serve. Messrs. Randolph and Harkness, in their affidavits, stated that, in their opinion, even if the charges were true, they do not affect Judge Davey's present fitness to serve as a judge. Ms. Daniels, in her affidavit, stated that, in her opinion, the charges were too *409 remote and that she knew of nothing that affected Judge Davey's present fitness to sit as a judge.
Specific testimony before the Commission included the following:
 "I think Kevin's reputation is an excellent one, as an honest, capable, hard-working judge, highly ethical. He is well respected by lawyers, other judges and by those people in the community who know him."  Stephen C. O'Connell, former Chief Justice of the Florida Supreme Court.
 "Judge Davey I found to be a very competent judge, who was fair, honest. He ruled promptly. He was very impartial in his rulings. He worked hard. My experience is that he is well prepared, and treats all parties and all lawyers with respect and impartiality."  DuBose Ausley, former Chairman of the Florida Ethics Commission.
 "[Judge Davey has] a reputation for being a truthful man of integrity... . I have worked with Judge Davey, I have seen his work, I am familiar with his work. I know the time of deliberation and how he sweats over those cases... ."  Judge J. Lewis Hall, Jr.
In addition to this testimonial evidence of present fitness, we note the following extenuating circumstances:
 Davey's misconduct was not directly related to the office of judge. The conduct did not involve clients or the courts.
 The conduct in issue was remote in time. It took place nearly a decade ago. The Commission did not file charges until nine years after the conduct took place.
 The misconduct took place in a highly-charged emotional atmosphere. Davey was in the midst of a bitter law firm breakup involving a great deal of animosity on both sides. The breakup generated a lockout letter and two civil lawsuits spanning many years.
 The misconduct was an isolated incident. Davey's record before and after the conduct in issue is spotless. The record shows no prior complaints filed with The Florida Bar or the Commission. Nor does the record show any filed since.

VII. CONCLUSION
The Commission showed by adequate proof that Judge Davey committed misconduct in his handling of the Bryant case after being elected to judicial office. He violated Canons 1 and 2A of the Florida Code of Judicial Conduct by misrepresenting the merits of the case to his former partners, and by concealing the negotiations, settlement, and fee.
The Commission, on the other hand, failed to show by adequate proof that Davey committed misconduct in his handling of the Breyer case. Further, the Commission failed to show that Davey deliberately made false statements before that body.
Davey's misconduct is serious and deserving of substantial discipline. We do not believe, however, it calls for removal in light of the extenuating circumstances noted above. The record fails to show that Judge Davey is presently unfit to perform judicial duties. Rather, the record suggests that his misconduct was an isolated incident  an aberration  produced by the highly-charged law firm breakup.
If Davey's conduct were truly evidence of a character flaw affecting fitness, we believe that some hint of this flaw would have surfaced in the many intervening years of rigorous and oftentimes stressful judicial assignments. Yet, no such evidence was presented before the Commission. Instead, virtually every piece of evidence on the subject contained in the record shows just the opposite  that Davey is an excellent, extraordinarily hard-working judge, who has compiled a spotless record over nearly a decade of public service. Davey's boss, Chief Judge Philip Padovano of the Second Judicial Circuit, after attesting to Davey's reputation for truth and veracity, concluded: "He's probably the hardest working judge we have in the whole circuit."
We do not believe that public confidence in the integrity of the judiciary will be eroded if Judge Davey remains on the bench. No evidence showing this was presented before the Commission. Instead, virtually all the evidence on this subject contained in the *410 record shows just the opposite  that the public and legal profession continue to regard Judge Davey highly. It is our abiding belief that public confidence in the judiciary is best served by the fair application of the law.
This case is analogous to that of attorney Harry King. See The Florida Bar v. King, 174 So.2d 398 (Fla. 1965). The Florida Bar charged King with testifying untruthfully before a grand jury eight years earlier during a heated bid for presidency of the Florida Senate. This Court approved the finding of guilt, but noted that "[d]isciplinary ... proceedings should be handled with dispatch." Id. at 403. We approved the following recommendation of the referee:
"If this matter had been brought before me shortly after the acts of misconduct, I believe that I would have unhesitatingly recommended disbarment for a substantial period, if not permanently. However, the situation has been drastically changed by the lapse of time and the actions of the respondent in the interim. The misconduct took place over eight years ago. It is the only act of misconduct ever attributed to the respondent. Before and since that time, he has conducted himself in an exemplary fashion and earned and retained the confidence of the Bench and Bar of his circuit. Under these circumstances, to recommend either disbarment or suspension would accomplish no worthy objective."
Id. at 402. We concluded that a public reprimand would be appropriate discipline for King:
In spite of the respondent's gross misconduct of nine years ago, we believe that by his subsequent exemplary conduct he has earned the right to continue to serve his profession. We believe that he will at all times in the future conduct himself in such manner as to rectify, insofar as he can, the blemish that he has placed upon his record.
Id. at 404.
Based on the foregoing, we find a public reprimand appropriate discipline under the facts of this case. We hereby reprimand Judge P. Kevin Davey for the actions noted above.
It is so ordered.
OVERTON, SHAW and KOGAN, JJ., and McDONALD, Senior Justice, concur.
HARDING, J., concurs with an opinion.
GRIMES, C.J., dissents with an opinion.
HARDING, Justice, concurring.
I concur with the majority that Judge Davey violated Canons 1 and 2A of the Florida Code of Judicial Conduct in connection with the Bryant matter. Further, I concur that a public reprimand is the appropriate sanction. In addition to the reasons set forth by the majority, I reach this conclusion in large part because the conduct which brought Judge Davey before the JQC was known before he ever took judicial office and has never been concealed since he took office. Even though this conduct was public knowledge, it was not brought before the JQC until nine years later.
I recognize that there is no statute of limitation on actions relating to judicial discipline. Yet, I am persuaded that a reprimand is the appropriate sanction in this case primarily because of the delay in bringing these charges. The matters which caused Judge Davey to be called before the JQC have been the subject of civil litigation over the years. Although the record is silent as to why there was such a delay in bringing the charges against Judge Davey, it has been suggested that the civil litigation had not concluded. If this is in fact the case, I find it unseemly. The pendency of civil litigation would not have tolled a statute of limitation for criminal charges.
Judge Davey was found guilty of misrepresentation and he, in effect, admitted his guilt. I agree with the majority that this is an isolated case. Had it been the result of a character flaw, it would have evidenced itself elsewhere over the years. Yet, it is troublesome to know that a judge has been guilty of being less than candid and honest. As the majority notes, we have ruled that judges are held to a higher standard than lawyers. Majority op. at 407; In re LaMotte, 341 So.2d 513, *411 517-18 (Fla. 1977). Even so, I find no reason that the concept of rehabilitation embodied in the Florida Bar Admission Rules and the Rules Regulating the Florida Bar should not apply here. Persons not admitted to the Bar because of a lack of candor or misrepresentation are allowed to reapply after a period of two to five years. Fla.Bar Admiss. R., art. III, § 4d. (applicant may petition Court two years after adverse finding by Board of Bar Examiners, but where applicant has made material misrepresentations or false statements in application process Board has discretion to extend that period up to five years). The rules even set forth the criteria to be used in determining whether the applicant has been rehabilitated. Id. at § 4e. In addition, a person who has been disbarred is permitted to apply for readmission after five years and permitted to show proof of rehabilitation. R. Regulating Fla.Bar 3-7.10(a). While there is no certainty that such an applicant will be admitted to the Bar, the existence of these procedures in the rules evidences a belief that persons guilty of misrepresentation may be able to rehabilitate themselves. Here, the evidence of Judge Davey's' rehabilitation is overwhelming. Majority op. at 408-409.
Notwithstanding the above, I still find Judge Davey's conduct to be very serious. I concur with majority's analogy of this case to The Florida Bar v. King, 174 So.2d 398 (Fla. 1965). Majority op. at 409-410. Had this charge been timely brought against Judge Davey, I would be inclined to remove him from office. As troublesome as the delay in bringing these charges has been to Judge Davey, to the JQC, and to this Court, that delay has worked in Judge Davey's favor. Because of the delay, Judge Davey has been able to show his present fitness to continue in office in a way that would not have been possible if the charges had been timely brought. I find that Judge Davey's present fitness mitigates the appropriate sanction to a reprimand.
GRIMES, Chief Justice, dissenting.
The Judicial Qualifications Commission made findings that through deceit and misrepresentation Judge Davey intended to convert the entire Bryant and Breyer fees to himself. If Judge Davey engaged in such conduct, he is not presently fit to hold office despite his unblemished judicial record. While some of the testimony is in conflict or subject to differing interpretations, there is clear and convincing evidence in the record to support the commission's findings. Therefore, I am compelled to conclude that Judge Davey should be removed from office.
NOTES
[1] Canon 1 is titled "A Judge Should Uphold the Integrity and Independence of the Judiciary."
[2] Canon 2 is titled "A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities."
[3] See, e.g., In re Leon, 440 So.2d 1267 (Fla. 1983) (judge removed after being formally charged with making false statements to the Commission). Cf. Bernal v. Department of Professional Regulation, 517 So.2d 113 (Fla. 3d DCA 1987) (order revoking medical license reversed where lack of candor before hearing officer was not formally charged). But cf. The Florida Bar v. Barket, 633 So.2d 19 (Fla. 1994) (lawyer disbarred after Florida Supreme Court found he exhibited lack of candor at criminal trial, even though lack of candor was not charged in Bar proceeding); The Florida Bar v. McKenzie, 581 So.2d 53 (Fla. 1991) (lawyer disbarred after testifying in "shocking and incredible" manner before the referee, even though lack of candor was not charged).