ON MOTION FOR REHEARING

PER CURIAM.
We grant appellees’ motion for rehearing to correct statutory citations and further clarify our original opinion filed April 17, 2002. We withdraw the prior opinion and substitute the following in its place.
Appellant, M.M., appeals a trial court order granting her parents’ (Grandparents) Motion to Withdraw Birth Mother’s and Birth Father’s Consent to have their infant son, J.T.M., adopted by a third party prospective adoptive couple. We reverse the trial court’s ruling with regard to M.M., because the Grandparents failed to present clear and convincing evidence that M.M. had abandoned J.T.M. The father, R.R., has not appealed this ruling. However, we conclude that the trial court properly found that R.R. abandoned J.T.M. and excused his consent.
The present case began when an adoption intermediary (Intermediary), on behalf of a prospective adoptive couple (Adoptive Couple), filed a Petition for Adoption of J.T.M., based upon consents to adopt signed by both birth parents. (Case No. 4D01-3447) The -Grandparents had previously filed their own Petition for Adoption. (Case No. 4D01-3467) After the second petition was filed, the Grandparents moved to intervene in the Adoptive Couple’s case. The trial court allowed the Grandparents to intervene, a decision which this court affirmed. Hausmann v. L.M., 806 So.2d 511 (Fla. 4th DCA 2001). The Grandparents filed Motions to Withdraw Birth Mother’s and Birth Father’s Consent in each adoption case, claiming that both birth parents had abandoned J.T.M. After a full evidentiary hearing regarding the abandonment issue, the court granted the Grandparents’ motions in both cases. These orders are almost identical. M.M. has appealed both of these rulings to this court.

Facts

M.M. became pregnant with. J.T.M. while living with R.R. in Kentucky. She was nineteen years old. M.M. and R.R. separated early in the pregnancy and M.M. returned to Florida, where she had grown up and where her parents, the Grandparents, live.
M.M. and the Grandparents had suffered a strained relationship for quite some time. The Grandparents believed M.M. to be irresponsible and immature. Upon hearing of the pregnancy, the Grandmother suggested that M.M. abort the child. When M.M. refused, the Grandmother obtained the name of an attorney who could place the baby for adoption. M.M. originally agreed to give the baby up for adoption but changed her mind before the baby was born.
Due to the volatile relationship between M.M. and the Grandparents, M.M. had moved into a two bedroom apartment with a male friend upon her return to Florida. While pregnant, M.M. began dating a different man, Tim, who moved in with M.M. and her roommate shortly thereafter.
M.M. gave birth to a boy, J.T.M., on October 1, 2000. M.M. had custody of J.T.M. for three months. During those three months, M.M., J.T.M., Tim, a German Shepard, and a puppy lived in one bedroom of a two bedroom apartment. M.M.’s Mend occupied the second bedroom with his dog.
According to witness testimony at the hearing on the Grandparents’ motions, the bedroom in which J.T.M. lived was in deplorable condition. The dogs urinated and defecated on the floor of the room. There *1136 were also beer bottles, garbage, urine, and dog feces throughout the room, which sometimes was not cleaned for days. It was dark, smoky, unventilated, and smelled horrible and foul. The carpets were chewed up by the dogs and the blinds were frequently closed during the day, prohibiting any light from entering the room.
The physical condition of J.T.M. was akin to the state of the bedroom. He consistently smelled of urine and other foul odors, his carseat was soaked with urine, he often had the remains of food on his face and neck, his diapers were not changed on a regular basis,, and his head was covered in cradle cap.
J.T.M. had a rash, primarily on his neck and chest area, from the time he was born. As the condition worsened close to Christmas, M.M. took J.T.M. to the hospital. The rash continued to worsen to the point that J.T.M. had to be taken to the hospital a second time on December 31. By this date, the rash had progressed to eczema with open sores and oozing green puss.
M.M. called the Grandmother to meet her at the hospital. After the Grandmother arrived, M.M. left her with J.T.M. to pick up Tim from work, but did not return for hours. The Grandmother was with J.T.M. when he was admitted and accompanied the medical staff in preparing him for care. When M.M. ' returned, the Grandmother accused her of abusing J.T.M. and reported it to the abuse hotline. M.M. forbade the Grandmother from seeing J.T.M. while the child was in the hospital. .
In response to the Grandmother’s report, the Department of Children and Families (DCF) sent an investigator to assess J.T.M.’s condition. M.M. told the investigator that she would be moving into Tim’s grandmother’s home with Tim and J.T.M. M.M. and Tim did in fact move into Tim’s grandmother’s home while J.T.M. was in the hospital. The investigator inspected the condition of this home. Dog feces was spread all over the lawn and the smell of dog feces overwhelmed the inside of the house. The investigator was refused entry into the room where J.T.M. would be sleeping. Based upon these observations, he determined that J.T.M. could not properly recover in that environment. M.M. and Tim both admitted that the house was covered with “forty years of dirt.”
When the investigator revealed his findings to M.M., she told him that she would not have the home cleaned in time for the baby’s homecoming and requested foster care. The Grandparents offered M.M. and J.T.M. .free use of a newly renovated duplex which they owned, but M.M. refused to live there without Tim and the dogs.
On January 3, 2001, DCF filed a Verified Shelter Petition and removed J.T.M. from M.M.’s care. The Grandparents were given temporary custody of J.T.M. against M.M.’s wishes. M.M. decided that she wanted to give J.T.M. up for adoption and contacted the Intermediary. On January 26, she signed a consent to have J.T.M. adopted by the Adoptive Couple. R.R. was contacted and signed a consent for adoption on February 13. M.M. and the Intermediary filed a Motion for Shelter Review and Change of Placement. J.T.M. was taken from the Grandparents and placed with the Adoptive Couple on February 16, where he has since resided.
When DCF learned that M.M. was placing J.T.M. for adoption, it voluntarily dismissed its dependency case, claiming that it no longer had jurisdiction.
After intervening in the adoption case filed by the Adoptive Couple, the Grandparents filed Motions to Withdraw Birth Mother’s and Birth Father’s Consent to *1137 have J.T.M. adopted based on abandonment by both parents. The trial court granted the Grandparents’ motion.

Discussion

To determine whether M.M.’s and R.R.’s consents were valid, we must examine the relevant statutes concerning adoption in Florida. Section 68.062, Florida Statutes (2000), states:
(1) Unless consent is excused by the court, a petition to adopt a minor may be granted only if written consent has been executed after the birth of the minor by:
(a) The mother of a minor.
(b) The father of the minor, if:
1. The minor was conceived or born while the father was married to the mother.
2. The minor is his child by adoption.
3. The minor has been established by court proceeding to be his child.
4. He has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor and has filed such acknowledgment with the Officer of Vital Statistics of the Department of Health.
5. He has provided the child with support in a repetitive, customary manner.
Section 63.072, Florida Statutes (2000), provides in pertinent part:
The court may excuse the consent of the following individuals to an adoption:
(1) A parent who has deserted a child without affording means of identification or who has abandoned a child;
(2) A parent whose parental rights have been terminated by order of a court of competent jurisdiction....
Section 63.032(14), Florida Statutes (2000), defines abandonment as:
A situation in which the parent or legal custodian of a child, while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child’s mother during her pregnancy.
Florida courts have ruled countless times on the issue of abandonment. Our supreme court has held that “[t]he determination of abandonment is fact-specific and, absent direction from the Legislature, [it] cannot dictate to trial courts precisely how to evaluate the factors that go into making this decision.” In re Adoption of Baby E.A.W., 658 So.2d 961, 966 (Fla.1995). Abandonment must be shown by clear and convincing evidence. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); E.A.W., 658 So.2d at 967; In re R.W., 495 So.2d 133, 135 (Fla.1986).
Clear and convincing evidence has been defined as an:
intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
E.A.W., 658 So.2d at 967 (quoting In re Davey, 645 So.2d 398, 404 (Fla.1994)).
In E.A.W. the court noted:
Our task on review is not to conduct a de novo proceeding, reweigh the testi *1138 mony and evidence given at the trial court, or substitute our judgment for that of the trier of-fact. Instead, we will uphold the trial court’s finding “[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court’s judgment in favor of terminating ... parental rights.”
Id. (quoting Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993)).
Although a ruling based on clear and convincing evidence presents a difficult case for reversal by an appellate court, the finding of abandonment requires an equally stringent review. Courts have held that because adoption completely severs parental ties, it must be shown that the natural parents have completely abandoned the child. In re Adoption of Noble, 349 So.2d 1215, 1216 (Fla. 4th DCA 1977). In Noble, the court held:
Neglect by the natural parents or disinterest and failure to carry out parental obligations does not justify adoption of a child by strangers over the natural parents’ objection. Temporary failures and derelictions of parents, while possibly justifying deprivation of custody, will not support judgment of adoption.
Id. at 1216-17.
Once abandonment has been proven by clear and convincing evidence, the abandoning parent is stripped of the ability to singlehandedly determine what is in the best interests of the child. As such, placement of the child could not be unilaterally chosen by the abandoning parent; the result being that any consent given by the parent would be rendered invalid. On the contrary, if abandonment cannot be established by the necessary standard, then the fundamental right of the parent to determine what is in the best interest of his or her child is undisturbed. It is with this understanding that we decide the present case.
Our review of the relevant case law on abandonment leads us to conclude that more is required to excuse consent than abuse, neglect, or even “temporary” abandonment. See Solomon v. McLucas, 382 So.2d 339 (Fla. 2d DCA 1980) (recognizing that “grounds which may legally justify depriving a natural parent of custody do not necessarily constitute grounds for severing the parental relationship permanently”). Abandonment, in its purest form, requires a complete relinquishment of responsibility. The lengths of time and the surrounding facts vary from case to case, but what remains constant is the deliberate action by the parent to leave the child behind or the refusal to assume parental responsibilities from the outset. See G.T. v. Adoption of A.E.T., 725 So.2d 404 (Fla. 4th DCA 1999)(finding abandonment by both parents where: 1) mother tried to give the baby to a sixteen year old friend, said she “would put him in a dumpster,” referred to the baby as the adoptive mother’s child, called him by a new name, moved to ’ New Hampshire and had no contact with the child for three years and admitted that the only reason she was attempting to regain custody was because of pressure from her family; and 2) father did not believe the child was his, moved to Alabama and did not communicate with the child for four years, ignored letters concerning child’s adoption, did nothing to ascertain the truth of his paternity and complained that the paternity testing facility was too far away from his home); B.A.W., 658 So.2d at 961 (finding abandonment where the birth father, although claiming that he was overjoyed to become a father, was found to have given no support to mother during pregnancy, accepted government checks from mother for her expenses, offered little if any emotional *1139 support, assumed a sexual relationship with a former girlfriend while the mother was pregnant, attended only one doctor’s appointment, and told the mother to “do whatever you have to do” upon hearing that the mother was planning on having the baby adopted).
In this case, M.M.’s treatment of the child certainly justified a DCF investigation and subsequent shelter petition. However, the dependency case had not progressed to the point of terminating parental rights, or even developing a case plan, when M.M. decided to have J.T.M. adopted. After DCF dismissed its case, the Grandparents were left with the option of proving to the court that M.M. had abandoned J.T.M. We conclude that the Grandparents faded to present sufficient evidence for a finding of abandonment. Accordingly, we reverse the orders of the trial court waiving M.M.’s consent to have J.T.M. adopted by the Adoptive Couple and remand these cases to the trial court for further proceedings consistent with this opinion.
Although R.R. has not appealed the trial court’s ruling, we find the evidence of abandonment sufficient to excuse his consent. R.R., through words and deeds, has demonstrated his refusal to assume any parental responsibilities concerning J.T.M.
AFFIRMED in part; REVERSED in part, and REMANDED.
STONE, SHAHOOD and TAYLOR, JJ., concur.