Attachment *48 *49 *50 *51 POLSTON, J., dissenting.
In this matter involving serious campaign misrepresentations in violation of the Florida Code of Judicial Conduct, I would impose a very severe discipline of a 90-day suspension without pay, a $50,000 fine plus the cost of these proceedings, and a public reprimand. However, unlike the majority, I would not follow the JQC's recommendation of removal because removal *52 is not consistent with our precedent involving this type of serious campaign misconduct. Therefore, I respectfully dissent.
I. BACKGROUND
On March 6, 2017, the Investigative Panel of the JQC filed a notice of formal charges against Judge Dana Santino. The charges alleged that Judge Santino made false or misleading statements about her opponent in advertisements and social media during her judicial campaign. Additionally, the charges concerned Judge Santino's defense of these statements in response to a complaint filed with the Palm Beach County Bar Association's Judicial Campaign Practices Commission (JCPC). In her answer, Judge Santino acknowledged that her comments were inappropriate, and she expressed regret for them. She explained that the Facebook page that was viewable for approximately one month was taken down at her direction. And Judge Santino acknowledged that the statements were inappropriate and violated the canons. However, she denied that those mistakes represent a clear and present unfitness for office.
On August 2, 2017, a final hearing was held before the Hearing Panel of the JQC. Santino's opponent for judicial office, Gregg Lerman, testified that he dealt with the other candidate for the seat "on an extremely friendly and personal basis" and "took the position with Ms. Santino that I not deal with her at all." Lerman testified that he "was admittedly unhappy that she was running on [his] dime, to put it bluntly, because [he] had been the one to sue the governor and paid the fees to sue the governor, and she jumped in after that." Lerman also was asked about derogatory statements he made about Judge Santino during the campaign. Specifically, when asked whether he commented, "I don't have the luxury of being an attractive woman riding on my husband's coattails," Lerman answered that he said something to that effect. Additionally, on the night of the primary, Lerman gave an interview where he stated that "the gloves are going to come off in the upcoming months." Shortly after, Lerman sent an email that stated, "I need your help in order to protect the integrity of the bench from becoming a vanity prize."
Judge Santino testified at the final hearing that all of the conduct alleged in the formal charges occurred in the last three and a half weeks of the campaign. As to the Facebook page, Judge Santino testified at the final hearing that the Facebook page was inappropriate and violated the canons. Judge Santino articulated that she had not been aware of the content of the page prior to it being posted and had the page taken down immediately when she learned of its existence. As to the email sent out by her campaign on October 12, 2016, Judge Santino admitted full responsibility for its language. Judge Santino testified that in the 5 days between the release of the JCPC advisory opinion and the final day of voting in the election on November 8, 2016, she did not release an apology or a retraction about the statements she had previously made or fire her campaign manager. However, Santino testified that she sent apology letters to Lerman and the members of the JCPC after the election was over.
Additionally, the Hearing Panel of the JQC heard testimony from witnesses on behalf of Judge Santino. Judge Jeffrey Colbath testified that he was serving as the Chief Judge of the Fifteenth Judicial Circuit when Judge Santino became a sitting judge in January 2018. Judge Colbath testified that he never got any complaints about Santino and that she volunteered to help out colleagues. Judge Colbath testified *53 that Judge Santino volunteers for weekend civil drug court that carries no extra compensation. When asked if Judge Santino was presently fit to sit as a county court judge, Judge Colbath stated, "I think she's presently fit. I think what's happened is unfortunate and worthy of your attention and consideration, but as far as her ability to do her job not only efficiently, but exemplary in the Palm Beach County Courthouse, I think she's good to go."
Judge Theodore Booras, who has served as a Palm Beach County Judge for 11 years, testified that he has known Judge Santino since 1993, when he was an assistant state attorney and she worked as a probation officer. Judge Booras testified that he also worked with Judge Santino when she worked for a community-based drug treatment program where she advocated for eligible individuals to be offered diversion programs. Judge Booras acted as Judge Santino's unofficial mentor in the civil division. Judge Booras testified that Judge Santino has a strong work ethic, is helpful to colleagues, well-regarded by practitioners, and has worked hard to manage her caseload. When asked about Judge Santino's fitness to serve as a judge, Judge Booras stated that Judge Santino is an excellent judge. The Hearing Panel also heard testimony from two lay witnesses who gave exemplary character references for Judge Santino.
As detailed by the majority, the Hearing Panel concluded that Judge Santino's statements violated Canon 7 of the Florida Code of Judicial Conduct, and it recommended her removal from office.
II. ANALYSIS
While I agree with the JQC and the majority that Judge Santino is guilty of serious campaign violations that warrant a severe penalty, I disagree with removal.
"The supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission and it may order that the justice or judge be subjected to appropriate discipline, or be removed from office with termination of compensation for willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office ...." Art. V, § 12(c)(1), Fla. Const. (emphasis added). "Removal is proper when clear and convincing evidence is present that the judge has engaged in 'conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.' " In re Hawkins , 151 So.3d 1200, 1216 (Fla. 2014) (quoting Art. V, § 12(c)(1), Fla. Const.).
This Court's imposition of removal in prior cases involving Canon 7 violations was dependent on misconduct in addition to campaign misrepresentations. See, e.g., In re Renke , 933 So.2d 482 (Fla. 2006) ; In re McMillan , 797 So.2d 560 (Fla. 2001). In In re McMillan , this Court ordered removal after Judge McMillan committed serious violations while campaigning and committed additional violations while a sitting judge. 797 So.2d at 573. During his campaign, Judge McMillan represented that he would favor the State and police in court proceedings and would side against the defense. Id. at 562. The JQC further alleged that, after taking the bench, Judge McMillan violated the canons when he presided over the first appearance of a DUI case that he personally witnessed and provided a statement to the police, a clear conflict of interest. Id. at 564. While acknowledging the severity of Judge McMillan's improper and misleading campaign tactics, this Court explained that his conduct "after he became a judge also places this case in a different category." Id. at 572. This Court concluded that the "combined effect of the proven misconduct, culminating *54 in a blatant breach of the fundamental principles of judicial ethics while sitting as a judge, demonstrate Judge McMillan's lack of fitness for office." Id. at 573.
This Court was once again faced with campaign misrepresentations plus additional conduct in In re Renke , 933 So.2d at 484. In his campaign materials, Judge Renke misrepresented that he was an incumbent, misrepresented his position on the Southwest Florida Water Management District, misrepresented his judicial experience, misrepresented endorsements, misrepresented his experience as a lawyer, and misrepresented the qualifications of his opponent. Id. at 485-86. Additionally, Judge Renke accepted illegal donations from his father, disguised as compensation, in violation of state finance laws. Id. at 495. In concluding that Judge Renke was presently unfit to hold office, which warranted removal, this Court explained that "[t]he JQC's finding of guilt on the severe campaign finance improprieties evidenced here, when coupled with Judge Renke's efforts to mislead the voting public as to his experience and qualifications to serve as judge, lead us to conclude that his conduct during his judicial campaign was 'fundamentally inconsistent with the responsibilities of judicial office.' " Id. at 495. (quoting In re Graziano , 696 So.2d 744, 753 (Fla. 1997) ).
More recently, in In re DuPont , 252 So.3d 1130, 2018 WL 4327901 (Fla. Sept. 6, 2018), this Court determined that removal was appropriate where the judge not only committed violations by making inappropriate campaign statements but also committed violations while serving on the bench. While campaigning, Judge DuPont falsely claimed that his opponent's wife and daughter had been arrested multiple times, improperly implied that his opponent changed his name to hide his past, falsely asserted that his opponent received a traffic ticket for passing a school bus with children on it, and inappropriately promised to never find a statute unconstitutional. Id. at S337-40, 252 So.3d at ---- - ----. However, in addition to these wrongful campaign statements, Judge DuPont also violated the canons by conducting first appearance hearings earlier than his judicial assistant had advised and when there were no lawyers present for the State or the defendants. Id. at S340, 252 So.3d at ----. And during a hearing involving support for a minor child, he ordered a deputy to search a party and to seize any money found after the party asserted an inability to pay for a parenting class. Id. at S387, --- So.3d at ----. Further, the Chief Judge of the Seventh Judicial Circuit "testified that he received far more complaints about Judge Dupont than any other judge." Id. at S340, 252 So.3d at 1139. In In re DuPont , this Court explained that "[b]ased on the misrepresentations Judge DuPont made during his campaign to attain his office as well as the other instances of misconduct during his time in office, we conclude that Judge DuPont has demonstrated a present unfitness to hold office and approve the recommended discipline of removal from office." Id. at S342, 252 So.3d at 1143.
In contrast, in determining the appropriate discipline in a case involving only serious improper campaign statements, in In re Kinsey , 842 So.2d 77 (Fla. 2003), this Court affirmed a public reprimand, fine of $50,000, and the cost of the proceedings. During her campaign, Judge Kinsey distributed campaign literature aligning herself with law enforcement, including several pamphlets that proclaimed a judge's role was to protect victims and put criminals behind bars in support of law enforcement. Id. at 80-85. Specifically, Judge Kinsey included a brochure where she was "standing with ten heavily armed police officers *55 that was captioned 'Who do these guys count on to back them up?' " Id. at 87. In determining Judge Kinsey's present fitness in relation to the violations, this Court explained that "[w]hile a reprimand alone is insufficient, there was no evidence that Judge Kinsey is presently unfit to hold office other than her misconduct involved in winning the election." Id. at 92 (quoting JQC findings). This Court supported the decision of a $50,000 fine, noting that this severe penalty was "to warn any future judicial candidates that this Court will not tolerate improper campaign statements which imply that, if elected, the judicial candidate will favor one group of citizens over another or will make rulings based upon the sway of popular sentiment in the community." Id. Accordingly, this Court determined that the appropriate discipline was a $50,000 fine, proceeding costs, and a public reprimand. Id.
The misconduct detailed in In re Kinsey is similar to the misconduct involved in the present case. In In re Kinsey , this Court determined that removal was not warranted when the judge utilized campaign materials to make improper campaign statements that implied she would favor a particular group in her rulings. See In re Kinsey , 842 So.2d at 92. Here, Judge Santino utilized a Facebook page and a campaign e-mail to make improper statements regarding her opponent's favoring of a particular group. Thus, similar to the discipline appropriate in In re Kinsey , Judge Santino's conduct warrants discipline other than removal.
Unlike this Court's prior election cases ordering removal, Judge Santino's misconduct is limited to campaign misrepresentations. It is undisputed that Judge Santino engaged in conduct amounting to serious campaign violations. The posted Facebook page suggested that Lerman was unfit as he was pro-defense, highlighting his extensive experience in criminal defense. Additionally, Santino's campaign e-mail framed her opponent's experience as "limited to criminal defense-representing murderers, rapists, child molesters and other criminals." However, this Court's prior cases resulting in removal for improper campaign statements involved additional misconduct by the judge. Judge Santino's misconduct does not rise to that level. Unlike the judge in In re Renke , Judge Santino did not commit serious campaign finance violations that amounted to illegal conduct. In re Renke , 933 So.2d at 484. Additionally, unlike the judge in In re McMillan or the judge in In re DuPont , Judge Santino did not commit any violations upon taking the bench that would suggest a present unfitness for office. In re McMillan , 797 So.2d at 565 ; In re DuPont , 43 Fla. L. Weekly at S338, S341-42, 252 So.3d at ----, ---- - ----. Because Judge Santino committed serious campaign misrepresentations without some additional misconduct establishing present unfitness, the recommendation of removal is not the appropriate discipline.
To be clear, the nature of Judge Santino's misconduct should be central to our analysis, but this Court also considers mitigating factors when reviewing the recommendation of the JQC. See In re Eriksson , 36 So.3d 580, 595 (Fla. 2010). While acknowledging the severity of Judge Santino's improper and misleading campaign tactics, her conduct after becoming a judge aids in the determination of present fitness for office. Judge Santino accepted full responsibility for her actions at every stage of these proceedings. Although it was a contentious election, as evidenced by the record, Santino did not attempt to excuse her conduct during the hearing and did not attempt to justify her actions in her two briefs to this Court. Additionally, after the election, Judge Santino sent apology letters to Lerman and the members of the *56 JCPC. See In re Davey , 645 So.2d 398, 405 (Fla. 1994) ("Where a judge admits wrongdoing and expresses remorse before the Commission, this candor reflects positively on his or her present fitness to hold office and can mitigate to some extent a finding of misconduct.").
This mitigation is considered alongside the exemplary character testimony received at the hearing. Judge Colbath, who served as the Chief Judge when Judge Santino joined the Fifteenth Judicial Circuit, testified that in his opinion, Judge Santino was presently fit to sit as a county court judge, pointing to her efficient and exemplary work at the courthouse. Additionally, Judge Booras, from the civil division, opined that Judge Santino is an excellent judge who has a strong work ethic, is helpful to colleagues, and well-regarded by practitioners.
Accordingly, Judge Santino's misconduct, although serious, is not sufficient to "demonstrate[ ] a present unfitness to hold office." Art. V, § 12(c)(1), Fla. Const. Therefore, a severe penalty rather than removal is warranted.
III. CONCLUSION
Based on our prior precedent involving serious and improper campaign statements but no additional misconduct, I would suspend Judge Santino without pay for 90 days, order her to pay a fine of $50,000, plus the costs of these proceedings, and remand this case to the JQC for a determination of the amount of such costs. Accordingly, I respectfully dissent.
CANADY, C.J., concurs.