HERSEY, Judge.
The Motion for Rehearing En Banc is granted. The opinion filed in this case on June 22,1994, is withdrawn and the following opinion is substituted in lieu thereof.
This appeal presents the question whether a baby girl bom out-of-wedlock was available for adoption. The legal issue is whether there was an abandonment by the birth father. The validity of the adoption of the baby girl, which we are also called upon to consider, depends upon our resolution of this issue.
After an evidentiary hearing, the trial court determined that there had been no abandonment. Upon rehearing the trial court reversed its decision, found abandon *920 ment, and approved the adoption, generating this appeal.
This court, in a three-judge panel two-to-one opinion issued earlier, reversed the trial court’s judgment, finding the record evidence insufficient to support a finding of abandonment. Upon motion filed by a party, we agreed to reconsider our position en banc as raising issues of exceptional importance. We now affirm the final judgment, approve the adoption, and certify a question to our supreme court.
As we have indicated, the precise question presented initially to the trial court and now, by appeal, to this court, is whether the baby girl, hereinafter Baby Emily, was available for adoption. If she was, then her subsequent adoption was valid and should be affirmed by our opinion. If she was not, then the adoption must be nullified and this case remanded.
Simplistically stated, the birth father’s consent to adoption was required in this case unless the evidence shows that he “abandoned” the child. § 63.072(1), Fla.Stat. (1992). The term “abandoned” is defined in section 63.032(14), Florida Statutes (1992), and provides, inter alia, that “In making this decision, [whether abandonment has occurred] the court may consider the conduct of the father towards the child’s mother during her pregnancy.”
The trial court made the following findings with which we have taken editorial license in some minor respects for reasons of clarity or materiality or confidentiality:
1. The natural mother, [ ], and the natural father had been living together for a period of some months when the natural mother became pregnant in November of 1991.
The Court finds that her testimony is un-refuted that she told the natural father of the pregnancy during the Christmas period of 1991. Her testimony at that time was that he had very little reaction to the fact that she was pregnant.
2. During December of 1991 and January 9, 1992, the natural mother was employed and was basically paying her own way. Her testimony was that she received neither financial or emotional support from the natural father during this period of time.
3. She was involved in an accident in January of 1992 and subsequent to that she was not able to work.
4. The natural mother testified that from that point forward she was a lonely and lost person. She received little, if any, financial support from the natural father and she survived on food which was purchased with [her] food stamps and gave her Aid to Dependent Children check to the natural father which basically covered her share of the rent on the unit they lived in. This testimony was substantiated by the testimony of Dr. Parkovich, the natural mother’s physician, who testified to the fact that the natural mother looked terrible during this period of time, that their meetings were tearful and emotional and that the natural mother was an emotional wreck and was having substantial problems at home with the natural father. The doctor further testified that the natural mother was not eating properly. Dr. Par-kovich testified to substantial money problems and that the natural mother could not believe that the natural father was having an affair during this trying period in her life. Dr. Parkovich also testified that the natural father never came to any of the doctor visits, never drove the natural mother to these visits and it was only because of the natural mother’s friends that she was able to attend her visits with her physician.
5. On February 13, 1992, the natural father signed a paper which “required” the natural mother to pay one-half of (in other words, her own) the expenses for rent, electric, water and telephone. Further the document required her to purchase her own food.
6. From February until June of 1992, the parties remained together and the testimony of the natural mother, collaborated by the testimony of her physician, and her neighbor, was that the financial situation between the parties did not change. In other words, the natural mother was, in effect, paying her own way.
*921 7. During this period of time, February to June, 1992, the natural mother’s testimony was that there was minimal, if any, emotional support from the natural father. At one point in time, her testimony indicated that there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother’s testimony was specific that the natural father not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was “worthless” and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together. The natural mother moved out of the natural father’s apartment in June of 1992. Sometime prior to this time, the natural mother testified that she had told the natural father she was considering adoption and the natural father’s response was “do whatever you have to do.”
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was “an ice cube” and showed no emotion of any kind either toward the unborn child or the natural mother herself.
8. From the time the natural mother moved from the apartment through July 9, 1992, she lived with her girlfriend. The testimony of both the natural mother and the girlfriend was that the natural father provided zero financial support during this time and to the best of the girlfriend’s recollection there was one telephone call from him to the natural mother during this period of approximately one and a half months.
9. During the period of June, July, and August, when the natural parents were living separate and apart, the natural mother’s testimony was that she received neither financial or emotional support from the natural father. The only telephone calls he made to her were at 2:00 or 3:00 o’clock in the morning and were basically made to aggravate her.
10. The natural father’s testimony was received initially in a hearing conducted by the Court on October 9, 1992.
The natural father’s testimony at that time was that he was earning the approximate amount of $300.00 to $400.00 a week, net, and that he was, in effect, financing all of the food and shelter for the natural mother and her food stamps were basically being used for her son who was also living with them.
11. Contrary to the natural mother’s testimony, the natural father testified that he was “overjoyed” with the fact that he was going to be a father.
12. During the entire course of the pregnancy, the natural father’s testimony was that he bought the natural mother one pair of stretch pants which the natural mother denied ever receiving.
13. The natural father testified that he bought a crib for $40.00, but the money actually came from his mother and was not money out of the natural father’s pocket.
14. The natural father testified that he was contacted by Attorney Charlotte Dan-ciu [the intermediary in the adoption proceedings] in July of 1992 and at that point he was emphatic that he was not going to give up the child for adoption and that he began his quest for legal representation at that time.
15. Additionally, the natural father’s testimony was that he did speak with the *922 natural mother on a number of occasions during the month of July and August which statements were denied by the natural mother. This testimony is inconclusive at best, but the more believable testimony, based on the preceding months of these parties’ lives, would be that the natural father had very nominal contact with her. 16. The test that the Court needs to follow is whether the testimony presented by the various witnesses establishes by clear and convincing evidence that the natural father did, in fact, financially and/or emotionally abandon the natural mother during the course of the pregnancy. The Court finds that abandonment did occur and, therefore, the Court grants the Petition for Rehearing and by the terms of this order will set aside the previous finding of lack of abandonment.
Specifically, the Court finds that the natural parents’ relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother’s accident. Specifically, even if the Court accepts the natural father’s testimony that he was supplying in excess of one-half of the finances of the natural parents, there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement the money that he was bringing in as a painter. Emotionally, the testimony is un-refuted that [she] was on her own as far as this pregnancy was concerned. The natural father went so far as to resume a sexual relationship with his former girlfriend at the time that his pregnant girlfriend was suffering from the injuries she received in the accident.
The Court specifically finds that the natural father offered minimal financial support to the natural mother and that the emotional support to the natural mother was nonexistent. More importantly, there was almost no testimony to establish that the natural father exhibited any type of feeling for the unborn child. In fact, it appears that if the prospective adoptive parents’ lawyer had not contacted him, he would have continued his passive stance of allowing the natural mother to “do what you have to do.” It was only when he was requested to put in writing his acquiescence to the adoption that he changed his position and attempted to assert a legal right. It is interesting to note that he did not rush to the mother’s side, offer her any financial assistance, or attempt to become a “prospective father.” What he did was rush to the Legal Aid Society of both Broward and Palm Beach Counties in an effort to get a free lawyer to start fighting for some supposed legal right that he had. If this was the man who was earning $300.00 to $400.00 a week net which he claimed he was making and using the money to support the natural mother, how could he possibly have qualified for the advice of the Legal Aid Society. More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally. Other than attempting to assert his legal rights, that sad fact has never changed.
[[Image here]]
ORDERED AND ADJUDGED that the evidence is clear and convincing that the natural father did not exhibit sufficient financial or emotional support to the natural mother during the course of the pregnancy to sustain the position that he did not “abandon” either the natural mother or the unborn child. As a result of that abandonment, the Court finds, and, so orders, that it is not necessary for the prospective adoptive parents to secure the consent of the natural father for their continued effort to adopt the minor child.
Additionally, because the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot.
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child *923 was abandoned (Florida Statute 68.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
The trial court did not and we need not distinguish between married and unmarried parents in discussing the issue of abandonment as it applies in this case. Because we conclude with a certified question, however, we suggest that there is a substantial practical and legal difference between the legal status of a birth father married to the birth mother and one who fathers a child out of wedlock. The married father is, from the outset, legally responsible to support the child. The unmarried father has no such automatic legal responsibility. He must take some positive action to assume the responsibilities of parenthood before he becomes entitled to exercise the rights of parenthood. This is only fair. It is also a recognized legal principle. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also, Caban v. Mamen, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). (We do not overlook the exception created by paternity suits, but that exception has no relevancy here.) It is therefore reasonable and logical to examine the question whether an unmarried father has in fact evinced a settled purpose to assume all parental duties and the corollary that if he “makes only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned.” Matter of Adoption of Doe, 543 So.2d 741, 745 (Fla.1989). The trial court found that to be the situation here.
The final judgment specifically grounded its conclusions upon facts established by clear and convincing evidence. This is the appropriate standard to be applied in a case that terminates parental rights. Kingsley v. Kingsley, 623 So.2d 780 (Fla. 5th DCA 1993). Our standard of review in such a case has been succinctly stated by the First District Court of Appeal in the following language, with which we agree:
We hold that a trial court’s determination that evidence is clear and convincing will not be overturned unless it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing....
Citing The Florida Bar v. Hooper, 509 So.2d 289 (Fla.1987). In Interest of D.J.S., 563 So.2d 655 (Fla. 1st DCA 1990). See also Myles v. Department of Health and Rehab. Servs., 590 So.2d 1053 (Fla. 3d DCA 1991).
The dissenting opinions not only question whether there was clear and convincing evidence, but also suggest that one of our precedents for appellate testing of a result required to be based upon a finding of clear and convincing evidence may be flawed. The real problem in this case does not center upon what the father did or did not do. The factual scenario emerges clearly and distinctly. The essential facts in this case were proven clearly and convincingly under any standard. The issue is not so much what he did or did not do: it is rather the legal effect of what he did and did not do. In other words: do the facts constitute abandonment under the statutes and ease law. This requires a legal rather than a factual determination, although the entire equation is a mixed question of fact and law, as it so often is.
Additional precepts that guide our evaluation of the final judgment under review require that we “review the evidence contained in the record on appeal in a light most favorable to the appellee, and afford the same consideration to all reasonable inferences to be drawn therefrom as the final order and judgment arrives in this court with a presumption of correctness.” Weiss v. Stone, 220 So.2d 403, 406 (Fla. 3d DCA 1969). See also Fawaz v. Florida Polymers, 622 So.2d 492, 495 (Fla. 1st DCA 1993), referencing the indulgence in the “presumption that the ap-pellee, as the prevailing party, is entitled to the benefit of all reasonable inferences that can be drawn from the evidence in a light most favorable to it, ...”
In essence the trial court found that the parties shared living expenses until early June of 1992. During that same period the father verbally and emotionally abused the expectant mother. As a consequence, she *924 moved out and, for the final three months of her pregnancy, there was no financial support, no physical assistance in obtaining medical care, including pre-natal care, or for any of her other daily living requirements (and thus, as well, those of the unborn infant) and any emotional factor contributed by the father was a negative influence. These findings are supported by evidence in this record.
We have previously referred to the case of Matter of the Adoption of Doe, the seminal supreme court case in Florida, to treat the very issues which we confront in Baby Emily. Recapitulating, in our case the parties shared expenses as lovers for a period of time. When cohabitation ended, financial, physical, and emotional involvement by the father ended as well. We modify that observation by recognizing that even before termination of cohabitation the emotional factor was a negative — not support, but abuse. Regardless, the totality of the circumstances here are stronger than Doe in support of a finding of abandonment.
Moreover, in Doe, the natural parents had resolved their doubts and differences and sought to bring their child back into the fold. There was no hint of unfitness of either parent nor of the lack of mutuality of their desire to be reunited with the infant. In contrast, Baby Emily’s mother remains convinced that the best interests of the child are better served by approving the adoption. The father has made only legal, after-the-fact gestures toward parenthood. The holding and rationale of Doe support an affirmance here.
The members of this court have struggled with the concept of emotional support as it relates to the issue of pre-birth abandonment. Several of the judges have penned tentative dissents or concurrences based upon the extent to which emotional support of the expectant mother by the birth father is factored into the trial court’s and therefore ultimately this court’s determination of the issue of abandonment. There is some feeling that emotional support or lack of it may be considered only where there is some indication that it has caused harm to the child. Another faction of judges feel that emotional support is impossible of qualitative or quantitative analysis and thus should not play any part in resolution of the ultimate issue. It is therefore necessary and appropriate that we point out that the trial court’s finding of abandonment and our affirmance of that finding is based upon the entire spectrum of “conduct” and is certainly neither limited to nor dependent upon the failure of the birth father to provide emotional support to the expectant mother. Further, the emphasis of the facts in this case is on emotional abuse rather than on a mere paucity of positive support. Were it otherwise, we would be confronted with more difficult evidentiary problems and a more complicated jurisprudential analysis.
Because of the concern of some of the judges, and recognizing that one factor in the trial court’s reasoning and thus a partial basis for our affirmance is the issue of emotional support or lack of it, we certify to the supreme court as a question of great public importance the following:
IN MAKING A DETERMINATION OF ABANDONMENT AS DEFINED BY SECTION 63.032(14), FLORIDA STATUTES (SUPP.1992), MAY A TRIAL COURT PROPERLY CONSIDER LACK OF EMOTIONAL SUPPORT AND/OR EMOTIONAL ABUSE OF THE FATHER TOWARD THE MOTHER DURING PREGNANCY AS A FACTOR IN EVALUATING THE “CONDUCT OF A FATHER TOWARDS THE CHILD DURING THE PREGNANCY.”
We affirm the final judgments appealed and remand for such further proceedings as may be appropriate.
AFFIRMED and REMANDED and QUESTION CERTIFIED.
DELL, C.J., and GLICKSTEIN, STONE, POLEN and PARIENTE, JJ., concur.
PARIENTE, J., concurs specially with an opinion, in which GLICKSTEIN and POLEN, JJ., concur.
KLEIN, J., dissents with an opinion, in which FARMER, GUNTHER, WARNER and STEVENSON, JJ., concur.
*925 FARMER, J., dissents with an opinion, in which GUNTHER and STEVENSON, JJ., concur.
STEVENSON, J., dissents with an opinion, in which GUNTHER and FARMER, JJ., concur.