HARDING, Justice.
We have for review In re Adoption of Baby E.A.W., 647 So.2d 918 (Fla. 4th DCA 1994), where the district court certified this question as one of great public importance:
IN MAKING A DETERMINATION OF ABANDONMENT AS DEFINED BY SECTION 63.032(14), FLORIDA STATUTES (SUPP.1992), MAY A TRIAL COURT PROPERLY CONSIDER LACK OF EMOTIONAL SUPPORT AND/OR EMOTIONAL ABUSE OF THE FATHER TOWARD THE MOTHER DURING PREGNANCY AS A FACTOR IN EVALUATING THE “CONDUCT OF THE FATHER TOWARDS THE CHILD DURING THE PREGNANCY.”
We have jurisdiction based on article V, section 3(b)(4) of the Florida Constitution.
G.W.B. is the birth father of Baby E.A.W., a child born out of wedlock in 1992 and placed with adoptive parents shortly after her birth. This case concerns whether G.W.B. abandoned the child and, ultimately, whether she was available for adoption. Without abandonment, G.W.B.⅛ consent was required for Baby EAW.’s adoption. See § 63.072(1), Fla.Stat. (1991).
The trial court initially found no abandonment, but reversed its decision on rehearing. On appeal, a three-judge panel of the Fourth District Court of Appeal voted two to one that G.W.B. did not abandon Baby E.A.W. On rehearing en banc, the court found abandonment by a vote of six to five. E.A.W., 647 So.2d 918.
As a preliminary matter we note that the certified question misquotes the applicable statute. Section 63.032(14), Florida Statutes (Supp.1992), allows a court to consider the father’s conduct toward the child’s mother— not toward the child, as the certified question says — during the pregnancy.[1] We thus de- *964 eide whether section 63.032(14) allows a trial court to consider lack of emotional support and/or emotional abuse in evaluating the conduct of the father toward the child’s mother during pregnancy.
We answer the reframed certified question in the affirmative because we find that the legislature’s use of the word “conduct” in section 63.032(14) encompasses a father’s lack of emotional support and/or emotional abuse toward the mother during her pregnancy.
G.W.B. raises two other issues. We have jurisdiction over these issues because of our jurisdiction to review the district court’s decision based on the certified question. Feller v. State, 637 So.2d 911, 914 (Fla.1994). First, we find no merit to G.W.B.’s argument that the trial court was unduly prejudiced by best-interests evidence because the final order on rehearing clearly indicates that the judge did not consider this evidence. Second, while we do not reweigh the evidence taken by the trial court, we find the evidence supports the trial court’s determination that there was clear and convincing evidence that G.W.B. abandoned Baby E.A.W.
I. FACTS
The facts in this case are based on the trial court’s detailed findings in its Order on Rehearing of Abandonment Issue, which is attached as an appendix to this opinion.
G.W.B. and the birth mother had lived together for some months when she became pregnant in November 1991.
The birth mother’s testimony was that G.W.B. had very little reaction when she told him during Christmas 1991 that she was pregnant. She was employed and paid her own expenses during December 1991 and part of January 1992, but could not work after an accident in January 1992. From that point on, she was lonely and received little financial support from G.W.B. She bought food with food stamps and gave a government aid check to G.W.B. for her expenses.
The birth mother’s doctor testified that the birth mother was emotional and having trouble at home during this time. G.W.B. did not accompany the birth mother to any of the doctor visits. The birth mother testified that G.W.B. did accompany her on one visit, but that he was an “ice cube.”
The birth mother gave further testimony that she received little, if any, emotional support from G.W.B. from February through June 1992. G.W.B. once grabbed her, shook her, and spit at her because she used his razor. He called her names and verbally abused her. In addition, G.W.B. had a drinking problem.
The birth mother moved out of G.W.B.’s home in June 1992. Sometime before this, she told G.W.B. that she was considering adoption. He told her to “do whatever you have to do.” Based on this response, she followed through with the adoption process.
From the time the birth mother moved out until Baby E.A.W. was born, the birth mother received neither financial nor emotional support from G.W.B. The only phone calls she received from G.W.B. came early in the morning and apparently were made to annoy her.
G.W.B.’s testimony was that he earned $300 to $400 a week during this time and that he effectively paid for food and shelter for the birth mother and her son from another relationship. He was overjoyed about becoming a father. During the pregnancy, he bought one pair of stretch pants for the birth mother and, using money from his mother, bought a crib. He spoke with the birth mother several times after she moved out.
G.W.B. testified further that Charlotte Danciu, an attorney-intermediary in the adoption proceedings, contacted him in July *965 1992. He told Daneiu that he would not give up the child for adoption and then sought legal representation.
After reciting its findings of fact, the trial court found clear and convincing evidence that G.W.B. financially and/or emotionally abandoned the birth mother during her pregnancy. The judge found that even if he accepted G.W.B.’s testimony that he paid for more than half of the couple’s expenses, “there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement his earnings.” The judge found that the birth mother was on her own emotionally during the pregnancy. G.W.B. even resumed a sexual relationship with a former girlfriend while the birth mother was pregnant.
In addition, the trial court found almost no testimony to establish that G.W.B. exhibited any feeling for the unborn child. It appeared, in fact, that if Daneiu had not contacted him, he would have continued his passive stance. Notified that the birth mother planned to put the baby up for adoption, he sought counsel. The trial court noted, “More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally.”
In determining that G.W.B. did not provide emotional or financial support to the birth mother, the trial court concluded in its September 1993 order:
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned (Florida Statute 63.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
A three-judge panel of the Fourth District Court of Appeal reversed the trial court’s finding of abandonment. Baby E.A.W., 647 So.2d at 941 (appendix reprinting the district court’s panel decision). The court found the evidence in conflict, but determined that G.W.B. supported the birth mother while he lived with her and objected to the adoption before the birth of Baby E.A.W. Id. at 948. The court also concluded that emotional support could not be used to determine abandonment. Id. at 949.
After rehearing en banc, the district court reversed the panel decision and found that G.W.B. abandoned Baby E.A.W. both financially and emotionally. Id. at 924. Recognizing the uncertainty over whether a trial court may consider emotional support in making its decision on abandonment, the district court certified the question to this Court. Id.
II. THE CERTIFIED QUESTION
We conclude that a trial court, in making a determination of abandonment, may consider the lack of emotional support and/or emotional abuse by the father of the mother during her pregnancy. G.W.B. conceded this point during oral argument, but our resolution of the certified question is not based on this concession. Our decision is based on caselaw and statutory language.
This Court first recognized in In re Adoption of Doe, 643 So.2d 741, 747 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), that evidence of a parent’s prebirth conduct is relevant to whether a parent has abandoned a child. Doe concerned an unmarried father who was financially able to — but did not — support his child prenatally. The Court found that, by his behavior, he waived his right to consent to the adoption of the child. Id. at 749. Although Doe primarily concerned the father’s ability to provide financial support to the mother, the Court also noted:
A finding of abandonment under chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent’s legal custody or relationship with the child.
Id. at 744 (emphasis added).
When this Court decided Doe, chapter 63 did not include a definition of abandonment. The Court looked to section 39.01(1), Florida Statutes (1985), which defined abandonment *966 in juvenile proceedings. The definition in chapter 39 did not discuss a father’s prebirth conduct, but the Doe Court nonetheless decided that such conduct is relevant because it “does tend to prove or disprove material facts bearing on abandonment.” Id. at 746.
After Doe, the Legislature amended section 63.032 to define abandonment. The definition tracks the one in section 39.01(1) (juvenile proceedings), but adds a sentence that is critical to the instant case: “In making this decision [of abandonment], the court may consider the conduct of a father toward the child’s mother during her pregnancy.” § 63.032(14), Fla.Stat. (Supp.1992) (emphasis added).
We find that by this language the Legislature clearly did not limit “conduct” to financial support. Conduct generally connotes behavior. Baby E.A.W., 647 So.2d at 927 (Par-iente, J., concurring specially); see also id. at 924 (majority opinion) (statute encompasses “entire spectrum of ‘conduct’ ”). Dictionary definitions of “conduct” include the act, manner, or process of carrying out a task and a mode or standard of personal behavior. Webster’s Third New International Dictionary 473-74 (1961).
Because we find the statute clear and unambiguous, we need not resort to rules of statutory interpretation and construction. See Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984). Thus, we conclude that the Legislature’s use of the general term “conduct” in section 63.032(14) allows a court to consider prebirth conduct such as emotional support and/or abuse by the father of the mother during pregnancy.
While conceding that section 63.032(14) allows a court to consider emotional support in making its determination of abandonment, G.W.B. urges this Court to quantify how much weight a court may give to a father’s lack of emotional support during the mother’s pregnancy. We are not in a position to assign weight in this manner. The determination of abandonment is fact-specific and, absent direction from the Legislature, we cannot dictate to trial courts precisely how to evaluate the factors that go into making this decision.
III. BEST-INTERESTS EVIDENCE
While conducting the rehearing on abandonment, the trial judge heard evidence that went to the best interests of Baby E.A.W. We agree with G.W.B. that best-interests evidence was not relevant unless Baby E.A.W. was available for adoption and that she was not available for adoption without a finding that she had been abandoned. But it is obvious that in this case the trial judge did not base his decision on best-interests evidence.
His order says:
[B]ecause the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot.
(Emphasis added.) The detailed, nine-page order on rehearing specifically indicates that the trial court based its decision on G.W.B.’s behavior toward the birth mother and thus refutes G.W.B.’s argument that the trial judge was unduly prejudiced by the best-interests evidence. We commend the trial judge for making clear in his order that he did not consider best-interests evidence in reaching his decision on abandonment.
IV. ABANDONMENT
The United States Supreme Court has held that natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982).
The liberty interest is not absolute, however. The Court has distinguished between married and unwed fathers, noting that “the mere existence of a biological link does not merit equivalent constitutional protection.” Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983). The substantial due process protection attaches only when an unwed father demonstrates a full commitment to the re *967 sponsibilities of parenthood by coming forward to participate in raising his child. Id.
We recognize the sanctity of the biological connection, and we look carefully at anything that would sever the biological parent-child link. To terminate a parent’s right in a natural child, the evidence must be clear and convincing. Santosky, 455 U.S. at 747-48, 102 S.Ct. at 1391-92; see also In re R.W., 495 So.2d 133, 135 (Fla.1986) (requiring clear and convincing evidence before terminating parental rights because of abandonment).
This Court has defined clear and convincing evidence as an
intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
In re Davey, 645 So.2d 398, 404 (Fla.1994). The trial judge is responsible for finding facts and for resolving any conflicts in the evidence. Florida Bar v. Hooper, 509 So.2d 289, 290-91 (Fla.1987). As we said in Davey, the evidence must be sufficient to convince the trier of fact without hesitancy. 645 So.2d at 404.
In his thoughtful dissent below, Judge Klein, among other things, questioned how the trial judge could initially find no abandonment, then determine after rehearing that abandonment had been established by clear and convincing evidence. Baby E.A.W., 647 So.2d at 934 (Klein, J., dissenting). We note that the trial judge received additional evidence on rehearing. In addition, our task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute our judgment for that of the trier of fact. Instead, we will uphold the trial court’s finding “[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court’s judgment in favor of terminating ... parental rights.” Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993), review denied, 634 So.2d 625 (Fla.1994).
Our review of the record shows substantial competent evidence to support the trial judge’s finding of clear and convincing evidence that G.W.B. abandoned Baby E.A.W. The evidence in the record reveals that G.W.B. showed little to no interest in the birth mother or the unborn child. Once the birth mother moved out of the home, he provided no financial or emotional support. As the trial court noted, the evidence suggests that G.W.B. might have continued his passive stance toward the birth mother and the child had Danciu not contacted him about adoption. Even then, the record shows that G.W.B. still did not make any move to provide financial or emotional support to the birth mother or the unborn child. We therefore approve the district court’s decision affirming the trial court’s finding of abandonment.
V. CONCLUSION
Accordingly, we answer the reframed certified question in the affirmative and approve the decision in Baby E.A.W. finding that G.W.B. abandoned Baby E.A.W. Thus, G.W.B.’s consent was not required before Baby E.A.W. could be placed for adoption.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW and WELLS, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., dissents with an opinion.
APPENDIX
IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR PALM BEACH COUNTY
CASE NUMBER: CD-92-5616-FY
In re: the Matter of the Adoption of a minor child.

ORDER ON REHEARING OF ABANDONMENT ISSUE

THIS CAUSE came before the Court upon the application of the prospective adoptive *968 parents for the entry of an order which would rehear this Court’s previous Order Denying Motion to Waive Birth Father’s Consent.
The Order Denying the Motion to Waive the Birth Father’s Consent is docket entry 28 and the Motion for Rehearing is docket entry 30.
At the initial evidentiary hearing conducted on October 9, 1992, the Court made findings that the natural father had not abandoned the natural mother during the prenatal period and, as such, the natural father’s consent to the adoption had to be obtained.
Subsequent to that hearing, this Court appointed counsel to represent the infant and the prospective adoptive parents also hired additional counsel to assert their continued application for custody and adoption.
This Court initially took testimony on February 11, 1993. At that time, the natural mother testified as well as a former fiancee of the natural father, a physician offered testimony as to the emotional condition of the natural mother during the pregnancy and two friends and former neighbors of the natural mother and natural father offered testimony as to the conditions that the natural mother lived in with the natural father during the pregnancy. The natural father’s brother also offered brief testimony at the initial hearing.
This cause was rescheduled for a continuation of the testimony, but was continued upon the agreement of all of the parties. For whatever reason the continuance may have been asked for, the cause was ultimately rescheduled for additional testimony which occurred on August 3, 1993. At that time, the natural father offered testimony, a psychiatrist offered testimony, two friends of the parties offered testimony and a mental health counselor for the natural father offered testimony.
The parties’ final argument and legal memorandums were submitted to the Court in writing and the last of those was received by this Court on August 24, 1993. Based upon all of the testimony, upon this Court’s review of the argument of counsel and the Court being otherwise fully advised in the premises, it is the finding of the Court as follows:
1. The natural mother ... and the natural father had been living together for a period of some months when the natural mother became pregnant in November of 1991.
The Court finds that her testimony is un-refuted that she told the natural father of the pregnancy during the Christmas period of 1991. Her testimony at that time was that he had very little reaction to the fact that she was pregnant.
2. During December of 1991 and January of 1992, the natural mother was employed and was basically paying her own way. Her testimony was that she received neither financial or emotional support from the natural father during this period of time.
3. She was involved in an accident in January of 1992 and subsequent to that she was not able to work.
4. The natural mother testified [sic] was that from that point forward she was a lonely and lost person. She received little, if any, financial support from the natural father and she survived on food which was purchased with food stamps and gave her Aid to Dependent Children check to the natural father which basically covered her share of the rent on the unit they lived in. This testimony was substantiated by the testimony of Dr. Parko-vich, the natural mother’s physician, who testified to the fact that the natural mother looked terrible during this period of time, that their meetings were tearful and emotional and that the natural mother was an emotional wreck and was having substantial problems at home with the natural father. The doctor further testified that the natural mother was not eating properly. Dr. Parko-vieh testified to substantial money problems and that the natural mother could not believe that the natural father was having an affair during this trying period in her life. Dr. Parkovich also testified that the natural father never came to any of the doctor visits, never drove the natural mother to these visits and it was only because of the natural *969 mother’s friends that she was able to attend her visits with her physician.
5. On February 13,1993, [sic] the natural father signed a paper which “required” the natural mother to pay one-half of (in other words, her own) the expenses for rent, electric, water and telephone. Further, the document required her to purchase her own food. ([S]ee Petitioner’s Exhibit Number One from the hearing on October 9, 1992[.])
6. From February until June of 1992, the parties remained together and the testimony of the natural mother, collaborated by the testimony of her physician, and her neighbor, was that the financial situation between the parties did not change. In other words, the natural mother was, in effect, paying her own way.
7. During this period of time, February to June, 1992, the natural mother’s testimony was that there was minimal, if any, emotional support from the natural father. At one point in time, her testimony indicated that there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother’s testimony was specific that [G.W.B.] not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was “worthless” and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together.
The natural mother moved out of the natural father’s apartment in June of 1992. Sometime prior to this time, the natural mother testified that she told the natural father she was considering adoption and the natural father’s response was “do whatever you have to do.”
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was an “ice cube” and showed no emotion of any kind either toward the unborn child or the natural mother herself.
8. From the time the natural mother moved from the apartment through July of 1992, she lived with her girlfriend. The testimony of both the natural mother and the girlfriend was that the natural father provided zero financial support during this time and to the best of the girlfriend’s recollection there was one telephone call from him to the natural mother during this period of approximately one and a half months.
9. During the period of June, July, and August, when the natural parents were living separate and apart, the natural mother’s testimony was that she received neither financial or emotional support from the natural father. The only telephone calls he made to her were at 2:00 or 3:00 o’clock in the morning and were basically made to aggravate her.
10. The natural father’s testimony was received initially in a hearing conducted by the Court on October 9, 1992.
The natural father’s testimony at that time was that he was earning in the approximate amount of $300.00 to $400.00 a week, net, and that he was, in effect, financing all of the food and shelter for the natural mother and her food stamps were basically being used for her son who was also living with them.
11. Contrary to the natural mother’s testimony, the natural father testified that he was “over joyed” with the fact that he was going to be a father.
12. During the entire course of the pregnancy, the natural father’s testimony was *970 that he bought the natural mother one pair of stretch pants which the natural mother denied ever receiving.
13. The natural father testified that he bought a crib for $40.00, but the money actually came from his mother and was not money out of the natural father’s pocket.
14. The natural father testified that he was contacted by Attorney Charlotte Danciu in July of 1992 and at that point he was emphatic that he was not going to give up the child for adoption and that he began his quest for legal representation at that time.
15. Additionally, the natural father’s testimony was that he did speak with the natural mother on a number of occasions during the month of July and August which statements were denied by the natural mother. This testimony is inconclusive at best, but the more believable testimony, based on the preceding months of these parties’ lives, would be that the natural father had very nominal contact with her.
16. The test that the Court needs to follow is whether the testimony presented by the various witnesses establishes by clear and convincing evidence that the natural father did, in fact, financially and/or emotionally abandon the natural mother during the course of the pregnancy. The Court finds that abandonment did occur and, therefore, the Court grants the Petition for Rehearing and by the terms of this order will set aside the previous finding of lack of abandonment.
Specifically, the Court finds that the natural parents’ relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother’s accident. Specifically, even if the Court accepts the natural father’s testimony that he was supplying in excess of one-half of the finances of the natural parents, there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement the money that he was bringing in as a painter. Emotionally, the testimony is unrefuted that [the birth mother] was on her own as far as this pregnancy was concerned. The natural father went so far as to resume a sexual relationship with his former girlfriend at the same time that his pregnant girlfriend was suffering from the injuries she received in the accident.
The Court specifically finds that the natural father offered minimal financial support to the natural mother and that the emotional support to the mother was nonexistent. More importantly, there was almost no testimony to establish that the natural father exhibited any type of feeling for the unborn child. In fact, it appears that if the prospective adoptive parents’ lawyer had not contacted him, he would have continued his passive stance of allowing the natural mother to “do what you have to do.” It was only when he was requested to put in wilting his acquiescence to the adoption that he changed his position and attempted to assert a legal right. It is interesting to note that he did not rush to the mother’s side, offer her any financial assistance, or attempt to become a “prospective father.” What he did was rush to the Legal Aid Society of both Broward and Palm Beach Counties in an effort to get a free lawyer to start fighting for some supposed legal right that he had. If this was the man who was earning $300.00 to $400.00 a week net which he claimed he was making and using the money to support the natural mother, how could he possibly have qualified for the advice of the Legal Aid Society. More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally. Other than attempting to assert his legal rights, that sad fact has never changed.
This Court realizes that the previous order denying the request for abandonment was very emphatic in its statement that the natural father had not abandoned the unborn child. However, upon the testimony presented during the application for rehearing, as well as upon the law as was set forth in the well reasoned briefs of.... ALL of the parties, the Court finds that it, in fact, must reverse its previous decision and find that the natural father did abandon this unborn child. The most important testimony that this Court feels establishes that fact is the *971 previously set forth facts of what the natural father did when the adoption application became a reality to him. It is inconceivable to this Court that the natural father would not have made some effort, ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with. He just did not do anything other than to run to the State of Florida to attempt to get a free lawyer. He showed not only a callous disregard for the natural mother, he also exhibited a complete lack of understanding or feeling toward the unborn child and the resulting chaos it would cause in the life of the infant after her birth and potential placement with the birth [sic] parents.
The finding of abandonment as it applies to the birth father is a very harsh remedy. However, to quote the landmark case of ADOPTION OF DOE V. ROE [sic], 543 So.2d 741 at page 744,
“The child’s well-being is the raison d’etre for determining whether a child has been abandoned by a parent or parents. A finding of abandonment under chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent’s legal custody or relationship with the child. Abandonment under chapter 63 is not a criminal prosecution for the purposes of punishing parents, it is a civil proceeding intended to serve the best interests of the child.”
Based upon the guidance as supplied by the Supreme Court from the above quotation, the mandates of Florida Statute 63, the finding of facts presented to the Court in the various hearings conducted herein and the Court being otherwise fully advised in the premises, it is
ORDERED AND ADJUDGED that the evidence is clear and convincing that the natural father did not exhibit sufficient financial or emotional support to the natural mother during the course of the pregnancy to sustain the position that he did not “abandon” either the natural mother or the unborn child. As a result of that abandonment, the Court finds, and, so orders, that it is not necessary for the prospective adoptive parents to secure the consent of the natural father for their continued effort to adopt the minor child.
Additionally, because the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which where [sic] raised to the introduction of certain exhibits and/or testimony would become moot.
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned (Florida Statute 63.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
DONE AND ORDERED in ... Palm Beach County, Florida, on this 14th day of September, 1993.
/s/ Circuit Judge

. Section 63.032(14), Florida Statutes (Supp. 1992), says:
"Abandoned” means a situation in which the parent or legal custodian of a child, while *964 being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father toward the child’s mother during her pregnancy.
(Emphasis added.)