PER CURIAM.
This is a judicial disciplinary proceeding concerning Seminole County Judge John R. Sloop. We have jurisdiction. See art. V, § 12, Fla. Const. Pursuant to our constitutional authority, we remove Judge Sloop from office for violations of the Code of Judicial Conduct in three separate incidents, the last resulting in the *1049 unjustified and preventable arrests and incarceration of eleven citizens. Having reviewed the record in this case, including Judge Sloop’s own admissions, we conclude that these incidents collectively demonstrate Judge Sloop’s present unfitness to remain on the bench. Judges stand at the pinnacle of the justice system, and each judge in this State represents the face of justice. This is particularly the case in county court, a “people’s court” where ordinary citizens come to resolve minor disputes and transgressions, often without counsel. In determining the discipline appropriate in cases of judicial wrongdoing, our obligation is first and foremost to the public and to our state’s justice system. We conclude that through his misconduct in this case, Judge Sloop has forfeited the privilege to serve on the bench.
FACTS
Florida’s system for investigating allegations of misconduct by judges and imposing discipline is set out in article V, section 12 of the Florida Constitution. Under the Constitution, the Judicial Qualifications Commission (JQC) is an independent entity comprising members who serve as an Investigative Panel and other members who serve as a Hearing Panel. In the first stage of JQC proceedings, the Investigative Panel investigates alleged misconduct and, where appropriate, files formal charges. A Hearing Panel of the JQC then hears evidence on the charges and makes findings, conclusions, and recommendations concerning both the alleged misconduct and the resulting discipline. Art. V, § 12(b), Flá. Const. This Court may accept, reject, or modify the Hearing Panel’s findings, conclusions, and recommendations and has authority to impose discipline, including removal from the bench. Art. V, § 12(c)(1), Fla. Const.
In this case, although the Investigative Panel advocated for the removal of Judge Sloop for the misconduct charged, the Hearing Panel recommended serious sanctions that stop short of removal. Under the constitution, it is this Court’s ultimate responsibility to determine the appropriate discipline, up to and including removal from office. See In re Henson, 913 So.2d 579, 589 (Fla.2005).
This case marks the fourth occasion Judge Sloop has faced allegations of judicial misconduct. Judge Sloop first came to the JQC’s attention early in his tenure as a county judge in Seminole County, where he has served since 1991. In his first year on the bench, he was investigated by the JQC for alleged misconduct in an eviction proceeding and for displaying a firearm in court. Those investigations concluded with private admonishments and findings of no probable cause. In 2002, the JQC again investigated Judge Sloop, this time for alleged rude and abusive behavior. Although the JQC again found no probable cause, it warned him about his temper. Judge Sloop acknowledges that at several points during his fifteen years on the bench, other judges have also cautioned him about his temper. With this history in mind, we address Judge Sloop’s most recent misconduct.
The current charges against Judge Sloop arise from three incidents in 2004. The allegations regarding the first two incidents, alleged in Counts Three and Four of the Amended Notice of Formal Charges filed by the Investigative Panel, were as follows:
In the case[ ] of State v. Ramos, (Case No.: 04-002343-CFA), ... you declined to release a defendant pursuant to the clear mandate of Florida Rule[ ] of Criminal Procedure 3.134, thereby re *1050 quiring the defendant’s release pursuant to a writ of habeas corpus.[1]
[[Image here]]
On or about October 18, 2004, in the case of State v. Mercano, (Case No. 94-12684 MMA), you were rude, abrupt, and abusive in your treatment of the defendant, acting more like a prosecutor than a [county] court judge.
In the pleadings and hearing before the JQC Hearing Panel, Judge Sloop admitted fault in both counts.
Regrettably, the previous JQC admonishments, feedback from the bench and bar, and other current charges serve merely as a backdrop for the misconduct alleged in Count One of this ease:
On or about December 3, 2004, you issued arrest warrants for approximately 11 traffic defendants who had not answered your docket call, but who were in fact, properly in an adjoining courtroom pursuant to their summonses or the direction of the judicial deputy sheriffs or bailiffs. You were informed of the circumstances, but nevertheless proceeded to have the arrest warrants carried out, and these defendants arrested, and you initially declined to release them. As a result, these traffic defendants remained in jail until their release was considered by another judge. You then revisited your arrest warrants.
Judge Sloop admitted this allegation as well.
The Investigative Panel sought removal from the bench. Because Judge Sloop contested this recommendation, a full hearing was held before the Hearing Panel. Following the hearing, the Hearing Panel made these findings on Count One:
The events of December 3, 2004, occurred in the new Seminole County Courthouse. Due to uncertainty as to which courtrooms judges would be located in based on delays in completion of the new courthouse, there was confusion as to precisely where citizens were required to respond to their traffic citations. Judge Sloop was assigned to courtroom 1A and Judge Erickson, also a county judge, was assigned to courtroom IB. Due to misdirection, the 11 people in question sat in courtroom IB for hours until Judge Erickson recognized that something was wrong and checked their paperwork. Judge Erickson then advised them that they were in the wrong courtroom and sent them to courtroom 1A.
Judge Sloop had ended his morning session at approximately 11:00 a.m. and before leaving the bench he had the Clerk issue arrests warrants on all individuals who had not shown up for their scheduled hearings. These warrants included the 11 citizens who had been in Judge Erickson’s courtroom. There was uncertainty as to precisely when these arrest warrants were actually signed but they were clearly issued before noon of December 3, 2004. At about 11:15 a.m. Bailiff Olli Csisko found Judge Sloop who was eating lunch and told him that certain of the people who had not shown up were now in his courtroom. The details on these people being directed to the wrong courtroom were not initially provided by Bailiff Csisko and Judge Sloop did not check further as to their prior location in the other courtroom. He simply told his bailiff that court was over and the warrants were already signed.
*1051 Subsequently, Judge Erickson and another county judge, Judge Herr, came to Judge Sloop and suggested to him that these people had been present in the wrong courtroom and should not be arrested. Another bailiff made the same or a similar suggestion. Judge Sloop’s reaction to all of these suggestions was that the warrants had already been issued and that each defendant had the obligation to appear in the proper courtroom. There was general concern among the judges and staff in the courthouse over these arrests.
Judge Sloop had left the courthouse during the noon recess on a personal errand and then returned at 1:15 p.m. to get ready for his calendar of First Appearances. He was finally convinced that the 11 individuals should be released and he signed orders for their “immediate release.” This was partly due to the fact that Judge Herr himself had actually prepared the paperwork. Chief Judge Perry was also taking steps to get these citizens released.
The release orders by Judge Sloop were time-stamped at 2:22 p.m., but not faxed by the Clerk to the jail until 3:49 p.m. Judge Sloop could give no explanation for the approximate 1-1/2 hour delay. Judge Sloop stated that his order required the “immediate” release of all of the individuals without bond and he was shocked when he learned that they actually were not released until approximately 9:00 p.m. that evening. Judge Sloop was not even aware of the number of people who had actually been arrested. He never saw the 11 arrested people in a group and was only advised that the number was 11 after they had been transported to jail. Judge Sloop repeatedly stated that he assumed that they would be immediately released and he denied having any idea that persons arrested under such circumstances would be strip searched in the jail facility. This was apparently the policy of the Seminole County corrections staff who operate the jail facility.
The arrests occurred on Friday and on the following Monday, Chief Judge Jámes Perry sat down with Judge Sloop and asked him why he had not solved the problem by simply walking back into his courtroom and taking care of it immediately. Judge Sloop responded that he did not understand why this was a “big' deal.” Judge Sloop had taken no steps to check on the citizens he had caused to be arrested.
The Hearing Panel also summarized the testimony of Alda Mae .Rugg and Ronald Parilla, two of the eleven persons arrested on December 3, 2004:
Both Rugg and Parilla gave graphic testimony that they had been misdirected by Sheriffs officers or courthouse per-sorinel to the wrong courtroom (Courtroom IB) and that they sat in- this courtroom for several hours and were then directed by Judge Erickson to go to Judge Sloop’s courtroom which was Courtroom 1A. Judge Sloop was not present because his court session had ended. The warrants had already been issued and signed and the 11 people, to their great surprise, were then arrested in Courtroom 1A beginning at approximately 11:24 a.m. They were handcuffed and chained by approximately 15 officers and transported to the jail where they were processed and strip searched. They remained in the jail for several hours. They were arrested before noon and were not released from the jail until approximately 9:00 p.m. 'that evening.
Those arrested were understandably outraged and frustrated. They had repeatedly demanded to be able to see the judge who had ordered their arrests. *1052 This request to the deputies and bailiffs was denied after bailiffs attempted to contact the judge. There were actually 12 people arrested. A juvenile had also been among those arrested but she was released by the deputies when her age was discovered before being transported to the jail. The records on all of these arrests and incarcerations were officially expunged and only came into evidence by stipulation and an order of the chief judge.
The prosecution offered in evidence three DVD’s which were electronically displayed before the Panel. The December 3, 2004, DVD showed the Sheriffs officers while actually arresting and placing the traffic offenders in custody in courtroom 1A. As described by Rugg and Parilla, the DVD showed each individual was handcuffed and chained and then transported out of the courthouse by the 15 officers who gathered from all over the courthouse. The arrests oe-curred in. Judge Sloop’s courtroom after he had recessed his morning session. He did not return to this courtroom until later in the afternoon.
The Hearing Panel found that the three instances of misconduct violated Canons 1, 2 A, and 3 B(2), (4), and (8) of the Code of Judicial Conduct. Canon 1 requires judges to personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. Canon 2 A requires judges to respect and comply with the law and “act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Canon 3, which concerns judges’ performance of their judicial duties, provides in pertinent part:
B. Adjudicative Responsibilities.
[[Image here]]
(2) A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.
[[Image here]]
(4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge’s direction and control.
[[Image here]]
(8) A judge shall dispose of all judicial matters promptly, efficiently, and fairly.
Although he admitted guilt on each of these counts, Judge Sloop presented evidence in mitigation that, after the December 3, 2004 incident, he completed anger management counseling and sought and received a diagnosis and treatment for Attention Deficit Hyperactivity Disorder (ADHD). Judge Sloop maintains that ADHD contributed to his poor judgment that day.[2]
Dr. Heidi Napolitano, a psychiatrist who began treating Judge Sloop in February 2005, testified before the Hearing Panel that Judge Sloop’s conduct on December 3, 2004, was caused at least in part by the then-undiagnosed ADHD. She stated that persons with ADHD are easily distracted, impulsive, and have a low frustration tolerance, all of which could have contributed to Judge Sloop’s poor decision-making on December 3. Dr. Napolitano testified that Judge Sloop reported that after being placed on stimulant medication, he could *1053 better tolerate situations, had a lower frustration level, and had greater patience— typical responses to medication for those with ADHD. Dr. Daniel Tressler, a clinical and forensic psychologist, testified that in counseling sessions since March 2005 based on Dr. Napolitano’s diagnosis, Judge Sloop has shown greater understanding of how he interacts with people, greater awareness of the outcomes of those interactions, and a significant improvement in empathy. Dr. Tressler testified that if Judge Sloop stays on medication and in therapy, there was little probability of a recurrence of the events resulting in the current charges of misconduct. However, Dr. Tressler also stated that results of personality tests suggested that in striving to demonstrate calm in difficult situations, Judge Sloop placed himself in “emotional over-control.” Dr. Tressler said he hoped that over time, Judge Sloop would be able to incorporate emotions into his life without worrying he would display inappropriate anger.
In rebuttal, counsel for the Investigative Panel presented the testimony of Dr. Deborah Day, a licensed psychologist who had given Judge Sloop a battery of personality tests. Dr. Day concluded that Judge Sloop likely has adult Attention Deficit Disorder, but she did not believe it contributed to his conduct on December 3, 2004. She testified that the testing indicated an “additional anger management issue related to his personality characteristics.” When asked how Judge Sloop’s anger is likely to be manifested, Dr. Day stated:
He is likely to be an individual who is rude, insensitive. We saw characteristics of having a lack of empathy, not recognizing how his behavior impacts on others. He likes to be in control, so there was a control feature to his anger. He is likely to use his anger as a control mechanism.
Dr. Day recommended that Judge Sloop readdress the anger issue, which’ she did not believe had been dealt with sufficiently in sessions with Dr. Tressler or in nine weeks of anger management counseling with another counselor. Dr. Day testified that although she could not reliably predict whether Judge Sloop would ever engage in similar misconduct, she thought “the data indicate [it] is more likely than not.”
The Hearing Panel found, “based on the admissions and the totality of the evidence, that Judge Sloop does have an ADHD disorder and that his treatment thus far has been beneficial.” The panel recommended a broad array of sanctions:
• A public reprimand by this Court and payment of the costs of the JQC proceedings;
• Suspension from the bench for 90 days without pay;
• A requirement that Judge Sloop pay the cost of the substitute judge who covers his caseload during his suspension;
• A requirement that Judge Sloop continue treatment and medication, and file a report with the JQC every six months confirming his treatment status;
• A requirement that Judge Sloop issue letters of apology to the eleven persons wrongly arrested, and publish a full-page newspaper apology;
• A requirement that Judge Sloop offer to make a personal apology to all those wrongly arrested;
• A requirement that Judge Sloop comply with his commitment to retire from the bench at the end of his current term in January 2011 and not seek service as a senior judge;
• A requirement that if Judge Sloop returns to the practice of law, he must continue his treatment and medication, *1054 and file reports under the supervision of Florida Lawyer’s Assistance, Inc.
In opting for a recommendation short of removal from the bench, the Hearing Panel pointed out that, as of the March 28, 2006 hearing, there had been no further incidents of improper behavior by Judge Sloop while on the bench. The Hearing Panel also noted that Judge Sloop was effectively managing a large civil caseload, to which he had been assigned after being removed from hearing criminal cases following the events of December 3, 2004. The Hearing Panel concluded:
The Investigative Panel argues that the 11 citizens should never have been subjected to arrest and incarceration and the accompanying insults which occurred even if some of these events were unforeseeable. It is asserted that Judge Sloop did not take the necessary steps to make certain that these arrests were absolutely necessary and to promptly release these people after they were arrested. In retrospect it is obvious that serious mistakes were made and that immediate action should have been taken. The question is, however, whether Judge Sloop is presently unfit to hold office and whether his conduct was fundamentally inconsistent with his being a judge. The Panel concludes that removal is not warranted.
[[Image here]]
... Judge Sloop may not have a personality which endears him to all of his fellow judges and court personnel. However, there simply has been no demonstration by clear and convincing evidence that he is not presently fit to remain in office.
(Emphasis supplied.)
DISCUSSION AND ANALYSIS
We first consider the JQC’s factual findings and determination that Judge Sloop violated the Code of Judicial Conduct as alleged, and then address the appropriate discipline.
I. Findings and Determination of Guilt
This Court upholds a JQC Hearing Panel’s findings on alleged misconduct that are supported by clear and convincing evidence. In re Woodard, 919 So.2d 389, 391 (Fla.2006). In cases in which a judge admits wrongdoing and the JQC’s findings are undisputed, the Court ordinarily concludes that the findings are supported by clear and convincing evidence. In re Diaz, 908 So.2d 334, 337 (Fla.2005); see also In re Andrews, 875 So.2d 441, 442 (Fla.2004).
In both his formal answer to the charges and the hearing thereon, Judge Sloop admitted the alleged misconduct. Further, he declined the opportunity to contest the JQC Hearing Panel’s findings in this Court. Therefore, no additional showing is necessary to support the JQC’s findings and its conclusion that, as to Counts 1, 3, and 4, Judge Sloop violated Canons 1, 2 A, and 3 B(2), (4), and (8) of the Code of Judicial Conduct as alleged. Additionally, based on our independent review of the JQC hearing transcript as well as the video of the proceedings forming the basis for the charges in Counts 1 and 4, we conclude that the Hearing Panel’s findings are supported by clear and convincing evidence. Accordingly, we approve these findings and the conclusion that Judge Sloop violated the Code of Judicial Conduct as alleged.
II. Recommended Sanction
“[T]he object of disciplinary proceedings is not for the purpose of inflicting punishment, but rather to gauge a judge’s fitness to serve as an impartial judicial officer.” In re McMillan, 797 So.2d 560, 571 (Fla.2001) (citing In re Kelly, 238 So.2d 565, 569 (Fla.1970)). We have authority under the constitution to *1055 remove a judge from office for “willful or persistent failure to perform judicial duties or for other conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office.” Art. V, § 12(e)(1), Fla. Const. “Malafides, scien-ter or moral turpitude” is not required for removal as long as the conduct demonstrates a present unfitness to hold office. Id. In fulfilling our constitutional responsibility to determine the appropriate sanction, we address two preliminary questions. First, what criteria do we use to determine whether particular misconduct demonstrates present unfitness to hold office? Second, what weight do we give the Hearing Panel’s disciplinary recommendation not to remove a judge from office?
A. Present Fitness to Hold Office
The standard of fitness to hold office calls for examination of misconduct from two perspectives: its effect on the public’s trust and confidence in the judiciary as reflected in its impact on the judge’s standing in the community, and the degree to which past misconduct points to future misconduct fundamentally inconsistent with the responsibilities of judicial office. Canon 1 of the Code of Judicial Conduct requires judges to personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. Canon 2 A requires judges to “act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Canon 3, which concerns judges’ performance of their judicial duties, provides that a judge shall be “patient, dignified and courteous” to all those with whom the judge deals in an official capacity. Fla.Code of Jud. Cond. Canon 3 B(4).
In opinions accompanying our removal of judges, we have linked the determination of fitness to remain in office to the effect of misconduct on public trust and confidence in the judges involved. As we recently stated in removing a judge for practicing law while still holding judicial office and in advising a client facing prosecution to flee the country, “[njeither those who appear before [the judge] nor the public at large can have confidence in a judge who has committed these flagrant violations of our ethics rules.” Henson, 913 So.2d at 582. In removing a judge for a pattern of deceit and deception, we stated that “[t]he judicial system can • only function if the public is able to place its trust in judicial officers.” In re Ford-Kaus, 730 So.2d 269, 277 (Fla.1999). In removing a county court judge for misconduct that included treating attorneys abusively and maintaining a hostile work environment, we explained that “[a] judgeship is a position of trust, not a fiefdom. Litigants and attorneys should not be made to feel that the disparity of power between themselves and the judge jeopardizes their right to justice.” In re Graham, 620 So.2d 1273, 1277 (Fla.1993). In removing a circuit judge for exerting judicial authority to obtain employment for a friend, we stated that “[t]he judicial system cannot provide the service required of it without public trust of judicial officers.” In re Graziano, 696 So.2d 744, 753 (Fla.1997). Further, we have concluded that a judge should be removed if he or she “commits a grievous wrong which should erode confidence in the judiciary,” independent of its actual public impact. In re LaMotte, 341 So.2d 513, 518 (Fla.1977) (emphasis supplied). -
,Our inquiry into whether judicial misconduct demonstrates a present unfitness to hold office is also forward-looking, in that it presents a window into judicial temperament and judgment. The Court’s concern that misconduct will recur is. evident in In re Crowell, 379 So.2d 107 (Fla. 1980), in- which we removed a judge for *1056 unfitness that was “substantially due to his tendency to lose his temper when confronted by the human failings and shortcomings of others.”; Id. at 110. We found “a pattern of conduct1 over a long period of time ... which demonstrates a lack of proper judicial temperament and a tendency to abuse the authority of the office.” Id.; see also In re Wood, 720 So.2d 506, 509 (Fla. 1998) (concluding that the Court would be inclined to impose sterner sanction than reprimand if not for judge’s assurances that he would continue anger and stress management therapy “until no longer necessary”); In re Lantz, 402 So.2d 1144, 1146 (Fla.1981) (concluding that circuit judge “is sufficiently rehabilitated to continue service”). To the degree that proven misconduct demonstrates that a judge lacks the proper judicial temperament, removal may be appropriate.
B. Weight Given JQC Recommendation
When we assess the effect of misconduct on a judge’s present fitness to remain in office, we normally place great weight on the Hearing Panel’s disciplinary recommendation. See In re Renke, 933 So.2d 482, 493 (Fla.2006). However, our recent decision in Renke demonstrates that the Court exercises its independent judgment in fulfilling its responsibility to protect the public from judges who are unfit to hold office. There we overrode a JQC recommendation and removed a judge who attained office through an election in which he committed campaign finance violations that amounted to a “fraud on the electorate” and were fundamentally inconsistent with the responsibilities of office. Id. at 495. As we stated in In re Davey, 645 So.2d 398, 404 (Fla.1994) (quoting In re LaMotte, 341 So.2d at 516), although the “findings and recommendations of the Judicial Qualifications Commission are of persuasive force and should be given great weight ..., the ultimate power and responsibility in making a determination rests with this Court.” In Davey, we rejected a JQC recommendation of removal from office because we found inadequate proof that Judge Davey committed one of the alleged acts of misconduct or that he deliberately made false statements before the JQC. Id. at 409. Here, all three instances of misconduct found by the Hearing Panel are supported by clear and convincing evidence.
In this case, we reject the Hearing Panel’s recommendation that Judge Sloop remain in office. Although the Hearing Panel concluded that there was not clear and convincing evidence of present unfitness, its recommendation is weakened by concerns suggesting that the Panel considers Judge Sloop only conditionally and temporarily fit to continue. First, the Hearing Panel recommended that the Court require Judge Sloop to continue his treatment and medication and file a biennial report confirming his treatment status. More importantly, the Hearing Panel recommended that Judge Sloop be required to retire from the bench at the end of his current term, in January 2011, and not seek service as a senior judge.
A determination that Judge Sloop is fit to remain in office for four years but unfit after that point would convey greater concern for the welfare of the judge than the welfare of the public. In striving to ensure a fair and impartial judiciary, we owe our allegiance to the people of Florida, not to individual judges. If Judge Sloop is fit to remain in office now, his misconduct to date would not render him unfit four years from now. Conversely, if that misconduct warrants mandatory early retirement in four years, it demonstrates unfitness to hold judicial office now.
*1057 We distinguish In re Downey, 937 So.2d 643 (Fla.2006), in which we accepted a stipulated disciplinary recommendation that permitted a judge to remain in office until the end of his term, less than six months from the date of our decision. We concluded that under the facts and circumstances of that case, “the stipulation present[ed] a reasonable, expeditious, and assured way of securing Judge Downey’s permanent removal from office.” Id. at 649. In contrast, Judge Sloop’s case does not come to us as a stipulation, and the recommendation of an enforced early retirement in four years does not present an expeditious method of removing an unfit judge from office.
C. The Appropriate Sanction in this Case
We conclude from the evidence presented to the JQC Hearing Panel that Judge Sloop has irreparably damaged public confidence in his judicial authority, and that he lacks the proper judicial temperament and judgment necessary to continue to serve as a judicial officer. Although we rely on all the misconduct established in the JQC hearing as well as Judge Sloop’s disregard of prior warnings concerning his demeanor, we focus primarily on the evidence in Count One of his failure to promptly order the release of the eleven citizens who had been directed to the wrong courtroom.
Before addressing Count One, we briefly discuss Count Four. Judge Sloop’s shortcomings in both temperament and judgment were on vivid display in his condescending tirade against Ms. Mercano. As alleged by the Investigative Panel, Judge Sloop was “rude, abrupt, and abusive” in his treatment of this defendant, and acted “more like a prosecutor than a court judge.”[3] Judge Sloop asserts that his conduct was purposeful and that he did not lose his temper. We are not sure which explanation is worse. Either way, his conduct violated a basic tenet of the Code of Judicial Conduct. A judge who cannot control his or her temper, or who acts disrespectfully to litigants, directly contravenes the command in Canon 3 B(4) of the Code of Judicial Conduct that “[a] judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity.”
Standing alone, Judge Sloop’s misconduct in Count Four might have warranted a sanction short of removal. However, his abusive treatment of Ms. Merca-no is merely the latest episode in a judicial career marred by displays of anger that have resulted in warnings by the JQC and fellow judges to Judge Sloop concerning his temper. “When a judge continuously acts in a manner to undermine [public] confidence, drastic remedial action, including removal from the bench, is required.” In re Trettis, 577 So.2d 1312, 1313 (Fla. 1991).
We acknowledge that in the past, we have imposed sanctions short of removal for judges who have repeatedly engaged in rude, abusive, or insulting behavior and then taken or agreed to steps to ameliorate the problem. See Woodard, 919 So.2d at 392 (approving stipulated sanction of public reprimand and “suitable anger management counseling”); In re Schapiro, 845 So.2d 170, 173-74 (Fla.2003) (approving stipulated discipline of public reprimand, public apology, and participation in psy *1058 chological/behavioral therapy with emphasis on sensitivity training); In re Schwartz, 755 So.2d 110, 114-15 (Fla.2000) (approving stipulated recommendation of public reprimand for judge who apologized for intemperate or discourteous conduct, and undertook a program of personal counseling and stress management); Wood, 720 So.2d at 509 (approving stipulated sanction of public reprimand for judge who made assurances he would continue course of medical treatment and anger management control until no longer necessary). Significantly/each of those cases involved a stipulation. Here, in contrast, the JQC Investigative Panel advocated for the offending judge’s removal from the bench.
We need not decide whether Judge Sloop’s tirade in October 2004 alone warrants removal, because it serves as a mere prelude to his much graver misconduct occurring less than two months later when he failed to halt the unjustified arrest and incarceration of eleven citizens on arrest warrants he had issued.
A trial court’s authority to order the arrests of persons who fail to appear pursuant to a summons or notice to appear carries a grave responsibility to exercise appropriate judicial restraint. Judge Sloop failed utterly in this regard. Although we do not fault him for issuing warrants when the individuals failed to appear when their cases were called, the gravamen of this offense is his failure to rescind the arrest warrants once he learned from two fellow judges and a bailiff that' the eleven persons had been directed to the wrong courtroom. How did Judge Sloop react, faced with this knowledge? ' As found by the Hearing Panel, he “left the courthouse during the noon recess on a personal errand.” Not only did he fail to immediately take action to rescind the arrest warrants; the testimony shows he just did not care. It was only after he returned from his personal errand that he was finally convinced that the eleven individuals should be released. But as the Hearing Panel concluded, by then another judge had prepared the paperwork and the chief judge was also taking steps to get the citizens released. Further, we can and do fault Judge Sloop for failing to follow up on his release orders, once issued, to ensure that they were promptly executed. Because he failed to personally ensure the citizens’ prompt release, all eleven were subjected to jail intake procedures that included a strip search, and were not released until 9:00 that evening.
The Hearing Panel gave credence to testimony that Judge Sloop was suffering from untreated ADHD when this incident occurred. However, Judge Sloop’s indifference over hours and then days to the plight of the' eleven persons arrested cannot be fully explained by the subsequent diagnosis. Perhaps the strongest indicator that Judge Sloop’s conduct demonstrates an unfitness to serve as a judge is his responses the following Monday to Chief Judge James Perry. That day, Judge Perry asked him why he had not solved the problem by simply walking back into his courtroom and taking care of it immediately. After an entire weekend to reflect on the incident, Judge Sloop responded that he did not understand why this was a “big deal.”
The arrest of eleven citizens and their continued confinement for nine hours is a very big deal. A judge’s fundamental responsibility is to protect the constitutional rights of others. Judge Sloop’s callous disregard for these individuals was the antithesis of his judicial obligations. His conduct in dealing with these citizens, and his failure to recognize the enormity of the situation — to our knowledge, he has yet to send letters of apology to the eleven persons arrested — constitutes a clear abuse of *1059 the authority of the office. Judge Sloop’s misconduct on December 3, 2004, brought tremendous disrepute upon himself and the justice system as a whole. We conclude that in engaging in the misconduct alleged and admitted in Count One, Judge Sloop has committed a “grievous wrong which should erode confidence in the judiciary,” weighing in favor of removal. See LaMotte, 341 So.2d at 518.
This misconduct. also leads us to conclude that Judge Sloop lacks the necessary temperament and judgment to continue to serve as a judge. We acknowledge that Judge Sloop presented evidence to the Hearing Panel that he has handled his judicial duties well, with no further allegations of misconduct, since being removed from criminal and traffic cases. However, the absence of subsequent misconduct while current charges are pending does not preclude a finding of present unfitness. See In re Renke, 933 So.2d 482, 495 (Fla. 2006). We also recognize that testimony shows that Judge Sloop has made efforts to address both his temper and the ADHD that he and the expert witnesses believe contributed to the misconduct in this case. However, these efforts are too little, too late. Although Judge Sloop sought a diagnosis, entered counseling, and completed an anger management course, he took these steps only after the negative publicity caused by his misconduct on December 3, 2004, made .JQC proceedings likely. Had he taken these steps earlier in his judicial career, perhaps in response to the prior JQC warnings or admonitions from fellow judges, he might have been a very different judge by October and December, 2004. .
Further, the expert testimony is in conflict on whether the type of misconduct at issue in these proceedings could recur, even with counseling and ADHD medication. Dr. Day, who administered a battery of personality tests in December 2005 and February 2006, after Judge Sloop had been in therapy and on medication for many months, testified that anger continues to be a prominent feature of his personality. Dr. Day stated that Judge Sloop remains likely to eventually become rude and insensitive, and use anger as a control mechanism. Judge Sloop’s therapist, Dr. Tressler, testified that Judge Sloop was over-controlling his emotions and, at the time of the hearing, had not mastered incorporating emotions into his life without worrying he would display inappropriate anger. The Hearing Panel made no findings on whether improper displays of anger were likely to recur. From the evidence presented to the Hearing Panel, wé are unconvinced that Judge Sloop can both effectively manage his temper and remain an effective jurist.
In short, we conclude that through his own actions culminating in the misconduct in' this case, Judge Sloop has lost the public’s confidence in his ability to perform his judicial duties in a fair, evenhanded, and even-tempered manner. Further, he has forfeited our confidence in his ability to perform effectively while controlling the personality traits that have led to three private warnings by the JQC, the abusive treatment of Ms. Mercano, and the wrongful arrest and incarceration of eleven citizens. Judge Sloop’s indifference to the anxiety, humiliation, and hardship imposed upon these eleven citizens reflects a callous disregard for others that is among the most egregious examples we have seen of abuse of judicial authority and lack of proper judicial temperament. Under all the circumstances, we conclude that Judge Sloop has engaged in “conduct unbecoming a member of the judiciary demonstrating a present unfitness to hold office,” requiring his removal under article V, section 12 of the Florida Constitution.
*1060 CONCLUSION
For the reasons set forth herein, we hereby remove Seminole County Judge John R. Sloop from that office, effective when this decision becomes final. We hope that our decision today will remind all judges of their solemn obligation to “personally observe” high standards of conduct “so that the integrity and independence of the judiciary may be preserved.” Fla.Code of Jud. Conduct, Canon 1. Serving as a judge is a privilege and not a right. Finally, we take this opportunity to apologize on behalf of the justice system to the citizens of the State, to the citizens of Seminole County, and in particular to the eleven citizens harmed by Judge Sloop’s misconduct in failing to promptly ensure their release.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.

. An allegation of the same misconduct in a second case was dismissed by the JQC prosecutor and has been redacted.

. In his formal answer to the JQC complaint, Judge Sloop characterized his ADHD diagno- • sis as an affirmative defense, but then presented the diagnosis and treatment as mitigation during'the proceeding before the Hearing Panel.

. We have viewed the DVD of Judge Sloop during his entire morning docket on the day of the Mercano matter. We note that Judge Sloop's displays of anger (or obvious attempts to restrain his temper) were directed not only at Ms. Mercano but also on occasion at the prosecutor and defense attorneys as well.